**YEAGER'S FUEL, INC., et al.**

**v.**

**PENNSYLVANIA POWER & LIGHT COMPANY.**

**LOSCH BOILER SALES & SERVICE COMPANY**

**v.**

**PENNSYLVANIA POWER & LIGHT COMPANY.**

**Civil Action Nos. 91–5176, 92–2359.**

United States District Court, E.D. Pennsylvania.

Jan. 31, 1997.

622

David L. Pennington, Catherine Panchou Cox, Brian P. Kirby, Glenn C. Equi, Robert Thomas Connor, Elizabeth McKenna, Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, PA, for Yeager's Fuel, Inc. in No. 91-CV-5176, Atlantic Oil and Heating Co., Ralph D. Weaver, Inc., Harned Durham Oil Co., Inc., Guy Heavener, Inc., Desousa Oil & Service Corp., Apgar Oil Co., Inc.

David L. Pennington, Catherine Panchou Cox, Brian P. Kirby, Glenn C. Equi, Robert Thomas Connor, Elizabeth McKenna, Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, PA, Wayne M. Thomas, Kohn, Savett, Klein & Graf, P.C., Philadelphia, PA, for Mansfield Fuel Oil Co., Deiter Bros. Fuel Co., Inc., C.A. Lessig, Inc., Schwanger Bros. & Co., Inc., Sico Co., Whitlock & Woerth, Inc., Zongora Fuel, Inc., Senick, Inc., Carlos R. Leffler, Inc., H. John Davis, Inc., Arthur J. Ulrich, Inc., Union Fuel Co., W.C. Reichenbach & Sons, Inc., Freyman's Fuel Oil Co., Inc.

Kent A. Gardiner, Christopher C. Fennell, Jeffrey H. Howard, Robert D. Rowe, Peter B. Work, Bradley S. Albert, Crowell and Moring, Washington, DC, for Penn. Power & Light Co.

Harold E. Kohn, Kohn, Savett, Klein & Graf, P.C., Philadelphia, PA, for Oil Heat Council of Lancaster Co., Inc.

Wayne M. Thomas, Harold E. Kohn, Kohn, Savett, Klein & Graf, P.C., Philadelphia, PA, for Penn. Petroleum Ass'n.

Kirchoff, Inc., Lancaster, PA, pro se.

Glenn C. Equi, Elizabeth McKenna, Harvey, Pennington, Herting & Renneisen, Ltd., Wayne M. Thomas, Kohn, Savett, Klein & Graf, P.C., Philadelphia, PA, for Losch Boiler Sales & Service Co.

Catherine Panchou Cox, Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, PA, for Yeager's Fuel, Inc., in No. 92-CV-2359.

## Table of Contents

I. Introduction .......................................................... 631
 A. Procedural History.............................................. 631
 1. The Initial Complaint ........................................ 631
 2. PP & L's First Motion for Summary Judgment .................. 632
 3. The Utility Commission ...................................... 633
 4. The Amended and Consolidated Complaint ...................... 633
 5. Scope of the Remand ......................................... 634
 B. Factual Background............................................. 634
 1. Plaintiffs' Position ........................................ 634
 (a). Costs and Efficiency .................................... 634
 (b). Programs and Initiatives ................................ 634
 (c). Specific Anticompetitive Conduct ........................ 635
 2. PP & L's Position ........................................... 637
 (a). Gas Utility ............................................. 637
 (b). All-Electric Development Agreements ..................... 637
 (c). Market Reaction ........................................ 638
II. Standard of Review ................................................. 638
III. Federal Antitrust Laws............................................. 639
 A. Sherman Act § 2 ............................................... 639
 1. Attempted Monopolization .................................... 639

*Table of Contents*—Continued

| | | | |
|---|---|---|---|
| (a). | | Specific Intent | 639 |
| (b). | | Predatory Conduct | 642 |
| (c). | | Dangerous Probability of Success | 644 |
| | (i). | The Relevant Market | 644 |
| | (ii). | Market Share | 646 |
| | (iii). | Pricing | 647 |
| | (iv). | Barriers to Entry & Competition | 648 |
| | (v). | Probability Conclusion | 648 |
| 2. | | Actual Monopolization | 650 |
| (a). | | Monopoly Power | 650 |
| 3. | | Monopoly Leveraging | 651 |
| B. | | Sherman Act § 1 | 652 |
| 1. | | *Per Se* Illegality of the Contested Agreements | 653 |
| 2. | | The Agreements are Exclusive Dealing Contracts | 655 |
| 3. | | Application of the Rule of Reason | 657 |
| 4. | | Conversion Grants | 660 |
| 5. | | Conclusion—Sherman Act § 1 | 661 |
| C. | | Clayton Act § 3 | 661 |
| 1. | | Distinguished from Sherman Act § 1 | 661 |
| 2. | | Quantitative Substantiality Test | 662 |
| 3. | | Qualitative Substantiality Test | 663 |
| 4. | | Conclusion—Clayton Act § 3 | 664 |
| D. | | Robinson–Patman Act § 2(c) | 664 |
| E. | | State–Law Claims | 666 |
| 1. | | Tortious Interference with Contractual Relations | 666 |
| 2. | | Unfair Competition | 667 |
| 3. | | Restraint of Trade | 668 |
| 4. | | Civil Conspiracy | 668 |
| F. | | Conclusion | 669 |

---

### *OPINION*

PADOVA, District Judge.

The Court commences another chapter in this protracted and multifarious litigation. Defendant, Pennsylvania Power and Light ("PP & L"), operates an electric utility in central and northeastern Pennsylvania and constitutes the sole source of electric power in those regions. Plaintiffs, fuel oil dealers,[1] compete directly with PP & L in the market for residential heating and related equipment in PP & L's service area. Plaintiffs contend that PP & L unlawfully restrained trade through business practices and marketing schemes in violation of both federal antitrust laws and state common-law. PP & L currently submits, for the Court's consideration, its Motion for Summary Judgment.

It should be noted at the outset that both parties have presented the Court well drafted, comprehensive, concise, and organized briefs, with relevant submissions attached thereto. During oral argument on the Motion, both sides crafted compelling arguments, and the Court, in evaluating this Motion, faces a difficult task. After much deliberation, and for the following reasons, the Court will grant in part and deny in part PP & L's Motion.

## I. INTRODUCTION

### A. PROCEDURAL HISTORY

#### 1. The Initial Complaint

In August, 1991, various fuel oil dealers filed a complaint in this Court alleging violations of §§ 1 and 2 of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C.A. §§ 1, 2 (West Supp.1996); section 2(c) of the Robinson–Patman Price Discrimination Act ("Robinson–Patman Act"), 15 U.S.C.A. § 13(c) (West 1973); section 3 of the Clayton Anti-

---

**1.** Plaintiffs are: Apgar Oil Co.; Atlantic Oil; H. John Davis, Inc.; Deiter Brothers Fuel; Desousa Oil; Freyham's Fuel Oil; Harned Durham Oil; Guy Heavener, Inc.; Carlos R. Leffler; C.A. Lessig, Inc.; Mansfeld Fuel Oil Co.; W.C. Reichenbach; Schwanger Brothers; Senick, Inc.; Sico Co.; Arthur J. Ulrich; Union Fuel Co.; Ralph D. Weaver, Inc.; Whitlock & Woerth; Yeager's Fuel, Inc.; Zongora Fuel, Inc.; and Losch Boiler Sales & Servs. Co.

trust Act ("Clayton Act"), 15 U.S.C.A. § 14 (West 1973); and section 1962(c) of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C.A. §§ 1961–1968 (West 1984 & Supp.1995). In April, 1992, Losch Boiler Sales & Service Company, a fuel oil and related equipment dealer, filed a separate complaint against PP & L in this Court asserting essentially the same claims, with the addition of a claim under § 3 of the Robinson–Patman Act, 15 U.S.C.A. § 13a (West 1973) and state-law claims of unfair competition and civil conspiracy. Both Complaints rested on the same factual allegations, and the Court consolidated the cases. (*See* Doc. Nos. 89, 144 (consolidating cases)). Generally, Plaintiffs alleged that PP & L engaged in illegal promotional strategies, such as cash incentives, reduced electric rates, rebates, and subsidized advertising, in an effort to encourage the installation of electric heat pumps in homes located in its service area.

## 2. PP & L's First Motion For Summary Judgment

In early 1992, PP & L moved for summary judgment. By Opinion and Order dated September 8, 1992, this Court granted in part and denied in part PP & L's Motion. *See Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 804 F.Supp. 700 (E.D.Pa.1992), *aff'd in part, rev'd in part*, 22 F.3d 1260 (3d Cir.1994) (*"Yeagers I "*). Accepting PP & L's contention that the challenged conduct constituted part and parcel of the Commonwealth of Pennsylvania's energy conservation policies, and having determined that the allegedly anticompetitive behavior was conducted "pursuant to a clearly articulated state policy and under active state supervision," the Court determined that *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), immunized PP & L from federal antitrust and racketeering liability. *Yeagers I*, 804 F.Supp. at 702. Similarly, the Court dismissed the RICO claim in the absence of a properly pleaded predicate act.

The United States Court of Appeals for the Third Circuit affirmed in part and reversed in part in *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 22 F.3d 1260, 1263 (3d Cir.1994) (*"Yeagers II "*). Reversing this Court's decision regarding the federal antitrust claims, *Yeagers II* narrowed the focus of those claims considerably, extending immunity to PP & L's practice of "offering builders and developers cash grants and other incentives, and ... offering consumers a special electric rate for installation of high efficiency electric heating systems." *Id.* at 1263. This protection did *not*, however, insulate PP & L "to the extent that [PP & L] made these offers contingent upon the all-electric development agreements ...., i.e., for actions undertaken in connection with all-electric development agreements." *Id.* at 1263, 1272. The Third Circuit described the all-electric development agreements ("all-electric agreements") as follows:

> Although not specifically alleged in the Oil Dealers' Complaints, PP & L apparently included in some of its incentive offers provisions such as the following:
>
>> Developer must agree that the entire development will consist of only electrically heated units during the term of this Agreement. Completion of a non-electrically heated unit shall void this Agreement and the System grants for future units in the development will revert to whatever applicable program, if any, is in effect at the time.

*Id.* at 1263.

In allowing to proceed those antitrust claims which alleged that "PP & L provided benefits to builders and developers in exchange for entry into all-electric development agreements," *id.* at 1263, *Yeagers II* bestowed immunity on PP & L with respect to the "RTS Rate" and other incentive programs that it offered "free of all-electric development agreements to builders and developers pursuant to a clearly articulated and affirmatively expressed policy." *Yeagers II*, 22 F.3d at 1264, 1266 (defining "RTS Systems" as those which "promote load management by heating water during off-peak hours ... and storing it for use during peak hours.... PP & L offered a special rate (the 'RTS Rate') to homeowners purchasing homes with these units because RTS systems are more expensive than electric baseboard heating"). To the extent that those incen-

tives *were* offered in conjunction with the all-electric agreements, however, PP & L received no immunity.

### 3. The Utility Commission

The Bureau of Conservation, Economics & Energy Planning (the "Bureau") is an arm of the Pennsylvania Public Utilities Commission ("PUC"). In an 1989 internal report, the Bureau "found that PP & L's offering of certain incentives to owners and builders to install high efficiency electric heating systems in new homes was a legitimate load management program." *Id.* at 1268. Despite the 1989 report approving PP & L's use of cash incentives, in March 1993, the PUC altered its policy, disallowing the use of such incentives. The PUC now requires approval of certain promotional activities implemented by utilities, "prohibits the use of cash to influence builders and developers[,] .... [and forbids] delivery of allowances such as cash or appliances to builders and developers in order to influence their choice of energy for use in new residential developments." *Id.* at 1269 (citing 52 Pa.Code § 57.63). Under the new PUC regulations—issued March 19, 1993 and effective July 24, 1993—a "promotional activity" includes:

> [a] thing done by a utility with the object of bringing about an increase, or preventing a decrease, in the quantity of its service purchased by the public or with the object of inducing any person to purchase its service, or select or install any appliance or equipment designed to use its service, in preference to a competing form of energy. A demand-side management program approved by the Commission, with the object of encouraging customers to conserve energy or to shift demand from or reduce demand during peak periods, shall not be considered a promotional activity for the purpose of this subchapter.

(Pl.'s Mem. Opp. Ex. 57 ("Pl.'s Ex.__") (citing 52 Pa.Code. § 57.61)). The new regulations specifically forbid any utility, in the absence of PUC approval, from *inter alia* "[d]eliver[ing] anything of more than token value to

an architect, engineer, builder, developer, or other person for services performed or to be performed in connection with realty, other than realty acquired or intended for acquisition by the utility for use in the conduct of its own business." (*Id.* (citing 52 Pa.Code § 57.63(2))).

In light of the PUC's changed position, *Yeagers II* further limited PP & L's immunity to *past* conduct: "[t]he fact that the PUC now prohibits such actions does not mean that PP & L should be denied state action immunity for its past activity." *Yeagers II,* 22 F.3d at 1269.

### 4. The Amended and Consolidated Complaint

On August 11, 1995, Plaintiffs filed an Amended and Consolidated Complaint ("Am. Compl.") containing additional factual allegations. Specifically, the Amended Complaint alleges that PP & L received advanced notice of all new construction in its service area, offered developers and builders cash grants for the installation of electric heat, and sought commitments from developers and builders to exclude fossil fuel from new developments. According to Plaintiffs, PP & L also offered and made cash payments to contractors and customers whose residences were already heated by fossil fuel in an effort to persuade them to convert those heating systems to electric ("conversion grants"). In exchange for the grants, the contractors and homeowners had to agree that the electric heating device would not be supplemented by any fossil fuel device.

The Amended Complaint presents eight Counts: § 1 of the Sherman Act (Count I); section 2 of the Sherman Act (Count II); section 2(c) of the Robinson–Patman Act (Count III); section 3 of the Clayton Act (Count IV); common-law restraint of trade (Count V); tortious interference with contractual relations (Count VI); unfair methods of competition (Count VII); and civil conspiracy (Count VIII). (*See* Def.'s Mem. Supp. Mot. Summ. J. Ex. 1) ("Def.'s Ex.__").[2]

---

**2.** By Order dated September 26, 1995, United States Magistrate Judge Charles B. Smith refined the allegations by striking all RICO claims previ-

ously dismissed; all antitrust claims concerning the RTS Rate that were previously dismissed; all class certification claims; the § 3 Robinson–Pat-

### 5. Scope of the Remand

PP & L is immunized only for the cash grants and other incentives it offered before July 24, 1993—including special rates for customers who installed high-efficiency heating systems—that were *not* conditioned on, or exchanged for, an agreement to exclude oil or fossil fuel for such residential uses. All other alleged incentives—including both the conversion grants and the all-electric agreements—which properly fall within the purview of the Amended and Consolidated Complaint, and which the Court has not dismissed, constitute the present scope of this litigation. The Court will examine such conduct herein, if and as implicated by PP & L's Motion.

### B. FACTUAL BACKGROUND

In the instant case, the parties performed extensive briefing and offered submissions designed to substantiate their respective theories of the case. They present different interpretations of the events that transpired in the heating, fuel, and equipment market in central and northeastern Pennsylvania between the late 1970s and the early 1990s. At this point, the Court examines both Plaintiffs' and PP & L's positions.

#### 1. Plaintiffs' Position

##### (a). Costs and Efficiency

Oil and fossil fuel present the most cost-efficient heating systems and are less to install and operate than their gas and electric counterparts. Electric heat involves heat pump systems as well as baseboard heating systems. When heating a space, the heat pump gathers outside air, funnels it through the pump, increases the air's temperature, and releases the air through vents into the space being heated. If the temperature drops below 45 degrees, the heat pump becomes inefficient. (Pl.'s Ex. 4 at 103).

"Resistance" or baseboard heat costs much less to install than oil or gas but its operating costs are two and three times the price of oil or gas. (Pl.'s Ex. 1 at 161; Ex. 22 at 8). While the heat pump presents a more efficient alternative to the electric baseboard, its operating costs are 30% to 40% higher than fossil fuel. (Pl.'s Ex. 22 at 8). In the space heating context, oil costs $11.07 per million Btu, gas $11.40, electric baseboard heat $22.56, and heat pump heat $13.77. (Pl.'s Ex. 48).[3] When heating water, the heat pump costs $10.25 per million Btu, with gas and oil costing $9.79 and $9.37 respectively. (*Id.*). When combined with oil as a supplemental heating system, however, the heat pump presents a lower operating cost than any single source of heat, lower than regular electricity, oil, propane, or the ordinary, unsupplemented heat pump. (Pl.'s Ex. 1 at 343; Ex. 17).

Electric heat also imposes higher installation costs. Specifically, in 1989, gas (forced air) cost $1,600 to install and $450 per year to operate, while the same numbers for oil, electric baseboard, and heat pump systems were $1,900/$429, $800/$1,245, and $3,000/$623 respectively. (Pl.'s Ex. 26 at 2). Electric rates have generally increased more rapidly than oil or gas. Between 1980 and 1990, electric rates increased 91%, gas rates increased 43%, and oil rates decreased 8% (Pl.'s Ex. 49). Electric heating equipment also depreciates and becomes obsolete faster than oil heating equipment. A heat pump only lasts for 10 to 15 years while oil heating equipment might last 30 years. (Pl.'s Ex. 58 at 16; Ex. 8 at 148).

##### (b). Programs and Initiatives

"As PP & L emerged from conservation directed programs in the 1970s and early 1980s, emphasis was directed to revenue growth while uncoupling the rate-of-demand growth." (Pl.'s Ex. 49 at 8). PP & L's revenue comes from three major sources, the

---

man Act claim; paragraph 37—alleging "[a]s part of its scheme, PP & L initiated a pricing schedule for its off-peak electric heating customers which provided electricity for such heating at less than PP & L's cost"—without prejudice to be addressed through a motion *in limine;* and the added claims of restraint of trade and tortious interference with contractual relations. (*See* Def.'s Ex. 2).

**3.** "Btu" refers to "British thermal unit;" "[t]he amount of heat required to raise a pound of water one degree Fahrenheit." *Black's Law Dictionary* 192 (6th ed.1990).

residential market ($800,587,000); the commercial market ($647,949,000); and the industrial market ($503,806,000). (Pl.'s Ex. 41). The residential market, by far the largest, became the target for revenue growth. In 1982 and 1983, PP & L sought to increase its sales by 3½% (Pl.'s Ex. 9 at 56–57).

Several PUC decisions, however, undercut PP & L's ability to generate revenue. Between 1978 and 1979, the PUC found that PP & L could no longer use the savings it achieved through sales to other electric utilities on an interchange to improve the earnings and profits of the company. Rather, the PUC ruled that.any savings accumulated had to be used to reduce the energy cost rate. (Pl.'s Ex. 9 at 52). Furthermore, in the early 1980s, PP & L constructed two nuclear power plants. Specifically, "Unit 1" of PP & L's Susquehanna nuclear power plant began commercial operation in 1983, and "Unit 2" at Susquehanna began commercial operation in 1985. PP & L appealed, albeit unsuccessfully, to the PUC in both 1983 and 1985, asking for a rate .increase to offset ·the increased costs associated with constructing Unit 1 and Unit 2. The PUC found, however, that PP & L was experiencing capacity that exceeded its requirements for the remainder of the century. (Def.'s Ex. 66 at 2–3; Pl.'s Ex. 9 at 53).

In order to increase its revenues, PP & L now had to make "sales through [its] own customers or through contract sales to other entities." (Pl.'s Ex. 52). PP & L looked to the residential market, specifically heat pumps, as the vehicle to increase kilowatt hour sales. (*See* Pl.'s Ex. 9 at 90; Ex. 28 (describing heat pumps as "the solution to PP & L's long term marketing needs"); Ex. 49 (remarking "[t]he electric heat pump is the primary competitor of gas heat in both single family and multi-family houses")). PP & L also began offering cash incentives for the installation of "offpeak" electric thermal storage systems which used heat pumps. As early as 1981, PP & L had been providing cash grants to.customers. (Pl.'s Ex. 9 at 69). Between 1985 and 1989, PP & L awarded between $750 and $1,200 per heat pump in "New Construction Grants" to customers who installed heat pumps. (Pl.'s Ex. 45 at

539; Ex. 55 at 1804–05; Def.'s Ex. 57). PP & L also began to approach developers to advance them advertising subsidies. (Pl.'s Ex. 9 at 75, 95).

PP & L has always been cognizant that (1) builders decide what type of heating equipment will be placed in a home and (2) installation cost is a "critical" concern for new home builders. (Pl.'s Ex. 1 at 124–25; Ex. 26 at 2).· PP & L therefore began to leverage its strong rapport with developers, assigning its best consultants to develop long term relationships. PP & L recognized that neither the oil nor gas companies, both. of which lacked extensive personnel and organization, could match this effort. (Pl.'s Ex. 9 at 73; Ex. 25). PP & L also reached out, in this respect, to the actual equipment contractors, forming the Central Eastern Pennsylvania Heat Pump Association ("CEPHPA"). PP & L required, as a condition for receiving grant payments, that a CEPHPA member install the heat pump. (Pl.'s Ex. 38 at 154650). In addition, PP & L engaged in cooperative advertising programs with heat pump contractors, furnished both labor and equipment warranties for heat pumps sold by those contractors, and offered installation bonuses for those contractors. (Pl.'s Ex. 22 at 7).

#### (c). Specific Anticompetitive Conduct

Between 1983 and 1995, PP & L paid in excess of $25 million in grants to builders, developers, and homeowners in an effort to induce the use of electric home heating in its service territory. (Pl.'s Ex. 60). PP & L designed these grant programs to block the extension of gas and fossil fuels into newly constructed developments. PP & L paid some grants in advance, in the hope that all homes in a new development would contain electric heating. (Pl.'s Ex. 22 at 5). In addition to cash incentives, PP & L provided builders with model homes and cooperative advertising arrangements. (Pl.'s Ex. 22 at 4; Ex. 24). The model home grants involved payments of up to $3,100 per model home, with PP & L paying the builder or contractor to install electric storage heating and water heating in the model. Under the cooperative advertising arrangements, PP & L would

provide grants for the model home installation of heat pumps, extend advertising allowances, pay as much as 50% of a builder's advertising costs, and provide development or on-sight signs and promotional materials. (Pl.'s Ex. 22 at 4–5).

In 1986, the price of gas and oil dropped substantially, increasing competition from both gas and oil companies in the heating market. (Pl.'s Ex. 9 at 93–94). In an effort to respond to this surge in competition, PP & L began using, as early as 1987, the all-electric agreements. (Pl.'s Ex. 24). The all-electric agreement was essentially a contract entered into between PP & L and a builder or developer that typically contained the following provision: "[d]eveloper agrees that the entire Development will consist of only electrically heated houses. Completion of a nonelectrically heated house shall void this Agreement, and the System grants for future houses in Development will be those announced by PP & L for the applicable time period." (Pl.'s Ex. 31).

The all-electric agreement required that (1) the structure built would be a "new single, town, twin, condominium, apartment, or manufactured home with a high efficiency air- or ground-sourced heat pump;" (2) the customer would install electric domestic water heating; (3) CEPHPA, and only CEPHPA, would install the heat pump; and (4) the heat pump would not be supplemented by oil, kerosine, coal, or natural or bottled gas. PP & L, although not a manufacturer of heat pumps, agreed to furnish extended warranties for heat pumps installed by CEPHPA. In exchange, the builder would receive a string of cash grants upon the installation of each system (or sometimes in advance), a cooperative advertising allowance, and reimbursement of cooperative advertising expenditures. In addition, the builder or developer agreed to actively promote heat pumps and to inform PP & L of the names of prospective home buyers for contact by PP & L. (Pl.'s Ex. 22; Ex. 31; Ex. 74). The agreements also applied to a developers' conversion of an existing home, imposing the same no supplementation requirement. While PP & L employed the all-electric agreements as marketing tools as early as

1987, it did not inform the PUC of this practice until May, 1995. (Pl.'s Ex. 30; Ex. 31; Ex. 36; Ex. 38; Ex. 61; Ex. 63; Ex. 64; Ex. 65; Ex. 67).

Certain benefits associated with its status as the sole source of electric power in the region provided PP & L with unfair advantages. PP & L identified the significant home developments through its "Major Load Study." (See Pl.'s Ex. 70 (using Major Load Study results to identify developments "that have committed a portion or the entire development for the installation of fossil fuel heating systems" and suggesting that action be taken to contact the builders and convince them that electric is a better alternative than fossil fuels)). PP & L received advance notice of new construction; enclosed "bill inserts" in electric bills as advertisements; provided underground wiring allowances to builders in contravention of a PUC ruling that builders were responsible for trenching and backfilling; disbursed payments through its thermal integrity program; and reimbursed builders for the costs of interior improvements. (Pl.'s Ex. 8 at 144–47, 218–19; Ex. 9 at 127–28, 148; Ex. 39; Ex. 43 at 4; Ex. 66; Ex. 74; Def.'s Ex. 59 at 410). PP & L also began initiatives to convert non-electric, existing homes to electric heat by using its customer database and the aforementioned bill inserts to target customers and by extending low-interest loans. A homeowner making the conversion could not supplement the electric system with an oil or gas system. (Pl.'s Ex. 9 at 127; Ex. 43 (stating "[t]he only market which has significant potential above and beyond that which we are presently addressing is the residential conversion market"); Ex. 72; Def.'s Mem. Supp. Mot. Summ. J. at 8; Def.'s Ex. 52; Ex. 53).

PP & L increased its market share of the new home market from 61.5% in 1981 to about 84% in 1986. This saturation (84% of the market) was 17% higher than the nearest utility, the Philadelphia Electric Co. (Pl.'s Ex. 8 at 135). As of November, 1987, only 9% of all new construction had oil heat. (Pl.'s Ex. 22 at 2). Despite PP & L's near control of the new construction market in 1986, it initiated the all-electric agreement program in the following year (1987) to fur-

ther the anticompetitive goal of complete domination. Between 1981 and 1995, 72% of all new homes built in PP & L's service area were electrically heated. (Pl.'s Ex. 46). According to estimates computed by PP & L in 1987, the absence of these marketing efforts would have reduced its share of the new home market to 55%. (Pl.'s Ex. 22 at 2).

In 1980, the last year before the grant program was initiated, heat pumps were found in only 12.1% of new residences. Between 1987 and 1995, 42,797 heat pumps were installed in 133,756 newly constructed residences, and the market saturation of heat pumps increased to an average of 32% during this period. (Pl.'s Ex. 46). In 1990, oil-heated households accounted for 41% of the market in the entire northeastern United States and 40% of the market in PP & L's service area. (Pl.'s Ex. 49 at 2).

### 2. PP & L's Position

PP & L offers a different interpretation of the facts regarding the home heating market in its service area. In the late 1970s, the PUC imposed strict regulations on gas companies that severely constrained line extension and essentially removed gas as a competitor from the heating market. The stringent PUC guidelines acted as a *de facto* "gas ban." (Def.'s Ex. 10 at 36–37). Beginning in 1981, PP & L began promoting the use of residential electric heating systems which used energy in off-peak periods. In 1982, PP & L offered cash grants of up to $1,200 to approximately 250 customers to encourage the installation of these systems and to offset their high installation costs. (Def.'s Ex. 57 at 378). PP & L required that, in exchange for these grants, the customer would agree to refrain from supplementing the system with another heat source. PP & L imposed this requirement to recoup its initial investment in disbursing the grant. (Def.'s Ex. 8 at 141). This system has carried different names over the years, i.e., the RTS System, the Electric Thermal Storage ("ETS") system, and the Supplemental Electric Storage Systems ("SESS") system.

In 1983, PP & L initiated the conversion grant program that offered cash grants for customers who converted from fossil fuel to off-peak electric heating systems. In 1987, PP & L added highefficiency electric heat pumps to the list of heating systems that entitled customers to cash grants. (Pl.'s Ex. 43). A typical conversion agreement required that CEPHPA install the heat pump, that the customer not supplement the system with a fossil fueled system, and that the customer install electric domestic water heating. Between 1988 and 1990, PP & L converted 350 homes. (Def.'s Ex. 15; Ex. 52; Ex. 53; Ex. 59). During the same period, PP & L was losing between 2,000 and 3,000 electric heat accounts per year. (Def.'s Ex. 11 at 228).

#### (a). Gas Utility

The PUC lifted the gas ban in the mid–1980s, and gas companies, specifically UGI Utilities ("UGI"), launched aggressive marketing initiatives designed to increase their share of the residential heating market. In 1987, UGI intensified marketing efforts in both commercial and residential markets against electric and fuel oil companies, resulting in increased market share. Specifically, UGI's share of the market for new homes constructed in its territory grew from 12% in 1987 to over 50% in 1995, and in 1995, UGI held a 98% market share in new residential developments where natural gas was available. In 1995, 60% of UGI's additions came from new home construction and 40% came from conversions from other fuels, principally oil. In the aggregate, between 1987 and 1995, UGI converted approximately 20,857 residential customers from other heating fuels to natural gas, 68% of which came from oil and 16% of which came from electric. Like PP & L, UGI uses cash rebates, enters into agreements with builders and developers, extends gas mains at no charge, offers reduced rates, engages in cooperative advertising with builders and developers, uses grants to induce conversion, and sells gas appliances at retail. (Def.'s Ex. 49 ¶¶ 4, 5, 8, 10, 11, 14, 15; Pl.'s Ex. 49).

#### (b). All–Electric Development Agreements

In 1987, as competitive pressure from the gas utilities mounted, PP & L responded

with the all-electric agreements, requiring that each development be "all-electric" and contain a minimum of 10 lots. (Def.'s Ex. 10 at 90; Ex. 16; Ex. 21). Because developers build over an extended period of time, they grew concerned that the grant levels might be reduced and that the payment of sequential grants as the homes reached completion would prove inadequate. To allay these fears, PP & L began to advance the grant money. (Def.'s Ex. 9 at 235–36). In 1989, PP & L expanded the new construction grant programs and the all-electric agreements to encompass the installation of high-efficiency heat pumps. (Def.'s Ex. 8 at 148–49; Ex. 9 at 218; Ex. 18). PP & L ceased using the all-electric agreements as a marketing tool after the PUC changed its regulations with regard to promotional activities in July, 1993. (Def.'s Ex. 66 at 4–5).[4]

### (c). Market Reaction

Between 1984 and 1995, PP & L's share of the entire home heating market never exceeded 31%. Beginning in 1972, PP & L's share of new residential connections was 44%. This number increased steadily until reaching an all time high in 1986 of 84%. From 1986 to 1995, however, that share declined to 53%. From 1981 through 1986, as PP & L's market share increased, PP & L paid grants for off-peak electric systems with respect to 1,587 new homes out of a potential 74,924 in its service area, only 2%. In 1986, when PP & L achieved its highest market share of new residential units, PP & L had not yet employed the all-electric agreements as a marketing tool (first used in 1987), and there was no program in effect to disburse heat pump grants (until 1989). (Def.'s Ex. 14; Ex. 17; Ex. 24; Ex. 55; Pl.'s Ex. 52). PP & L holds a smaller market share (31% or 333,317) of all homes in its service area (1,074,015) than the oil dealers (35.4% or 380,463). (Def.'s Ex. 14; Ex. 20).

Between 1981 and 1995, PP & L paid grants for electric heat installations in only 29,512 homes out of a potential 208,681 new

home connections made in those years. In the years between 1987 and 1995, PP & L entered into only 120 all-electric agreements out of a potential 1,500 new residential developments started in its area. (Def.'s Ex. 10 at 253; Ex. 24). Similarly, the provisions in those agreements requiring that all units contain electric heating systems proved ineffective. From 1987 through 1995, PP & L's share of the new residential market steadily declined. Indeed, several builders and developers testified that they installed the heating system of their choice irrespective of the language articulated in the all-electric agreements. Out of the new developments started in PP & L's service area, some 85% chose *not* to enter into grant agreements with PP & L. (Def.'s Ex. 21; Ex. 25; Ex. 29; Ex. 30; Ex. 31; Ex. 35; Ex. 41; Ex. 44; Pl.'s Ex. 49).

## II. STANDARD OF REVIEW

█ "At one time, the Supreme Court endorsed a slightly stricter standard of review when a summary judgment order was challenged in an antitrust case." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 747 (3d Cir.1996) (citations omitted). The Supreme Court abandoned that approach, however, in 1992, and the ordinary Rule 56 standard still applies. *Id.* (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 468–69, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992)). *See Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 481 (3d Cir.) (stating "[i]t may be that because antitrust cases are so factually intensive that summary judgment occurs proportionately less frequently there than in other types of litigation, but the standard of F.R.C.P. remains the same"), *cert. denied*, 506 U.S. 868, 113 S.Ct. 196, 121 L.Ed.2d 139 (1992).

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

---

4. Plaintiffs contend that PP & L continued to use the all-electric agreements after July, 1993. (Def.'s Ex. 66 (stating "PP & L has signed approximately 25 agreements and proposed agreements with builders/developers since July 23, 1993. Of these, only four contained an all-electric commitment, two dated July, 1993, one dated August, 1993, and one dated September, 1993")).

admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is sufficient evidence for a reasonable jury to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Furthermore, bearing in mind that all uncertainties are to be resolved in favor of the nonmoving party, a factual dispute is only "material" if it might affect the outcome of the case. *Id.* Rule 56(c) directs summary judgment "after adequate time for discovery ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## III. FEDERAL ANTITRUST LAWS

### A. SHERMAN ACT § 2

Section 2 of the Sherman Act provides: "**Monopolizing trade a felony; penalty**[:] Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C.A. § 2 (West Supp.1996). Plaintiffs' § 2 claim alleges "PP & L's actions constitute abuse of monopoly power, attempt to monopolize, leveraging of monopoly, predation through governmental processes and conspiracy to monopolize." Am. Compl. ¶ 64. PP & L's Motion seeks summary judgment on these claims, maintaining (1) it "has not monopolized or attempted to monopolize the home heating market in violation of Sherman Act § 2," (2) that absent market power, there is no "predatory conduct" within the meaning of § 2 of the Sherman Act, and (3) "Plaintiffs' Monopoly leveraging theory has no merit." (*See* Def.'s Mem. Supp. Mot. Summ.J. at 18, 42).

### 1. Attempted Monopolization

To establish a successful claim under § 2 of the Sherman Act for attempted monopolization, Plaintiffs must "present concrete evidence that (1) [PP & L] had engaged in predatory conduct or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 750 (3d Cir.1996). *See also Pennsylvania Dental Ass'n v. Medical Serv. Ass'n of Pennsylvania,* 745 F.2d 248, 260 (3d Cir. 1984) (listing only two elements for attempted monopolization claim, "(1) a specific intent to monopolize; and (2) the consequent dangerous probability of success within the relevant geographic and product markets" but stating "[d]irect evidence of specific intent need not be shown; it may be inferred from predatory or exclusionary conduct") (citing *inter alia Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *United States v. Jerrold Elec. Corp.,* 187 F.Supp. 545, 567 (E.D.Pa.1960), *aff'd,* 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961)), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985).

### (a). Specific Intent

"[P]laintiffs alleging [attempted] monopolization under § 2 must produce intent evidence." *Advo, Inc. v. Philadelphia Newspapers, Inc.,* 51 F.3d 1191, 1199 (3d Cir.1995). "Specific intent is the intent to accomplish the forbidden objective, an intent that goes beyond the mere intent to do the act. Intent may be inferred by anticompetitive practices or proven by direct evidence." *Great W. Directories, Inc. v. Southwestern Bell Tel. Co.,* 63 F.3d 1378, 1385 (5th Cir. 1995), *withdrawn and superseded in part,* 74 F.3d 613 (5th Cir.1996). In establishing specific intent, "a mere intention to prevail over rivals or improve market position is insufficient. Even an intent to perform acts that can be objectively viewed as tending toward the acquisition of monopoly power is insufficient, unless it also appears that the acts were not predominantly motivated by legitimate business aims." *Pennsylvania Dental,* 745 F.2d at 260–61 (citations omitted).

Plaintiffs maintain that the record contains ample evidence of PP & L's specific intent to monopolize the residential heating market. Furnishing direct evidence, Plaintiffs point to a statement made by a PP & L marketing executive that "[w]e're striving for total dominance in the new home market. We believe you can put electric heat into at least 85% of all new homes built in our service area this year." (Pl.'s Ex. 43 at 4). PP & L's consistent attempts to increase market share, even after achieving an 84% share in the new home market and a 98% share in the vacation home market, argue Plaintiffs, indicates an unrelenting intent to monopolize. (Pl.'s Ex. 1 at 65–66; Ex. 5 at 85–87).[5] Plaintiffs also point to restrictive covenants PP & L inserted in property deeds requiring that electricity constitute the sole source of energy for homes constructed on the land. (Pl.'s Ex. 53). Plaintiffs rely on *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 609 n. 39, 105 S.Ct. 2847, 2860 n. 39, 86 L.Ed.2d 467 (1985) (stating "[p]roof of specific intent to engage in predation may be in the form of statements made by officers or agents of the company ... or *evidence that the conduct was not related to any apparent efficiency* ") (citation omitted) and *Kelco Disposal, Inc. v. Browning–Ferris Indus. of Vermont, Inc.*, 845 F.2d 404, 408 (2d Cir. 1988) (remarking that "tough talk by defendant's employees, coupled with the proof of predatory pricing, more than supports the jury's finding of a specific intent to monopolize"), *aff'd*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989).

Plaintiffs suggest the record also contains proof of predatory conduct that serves as indirect evidence of specific intent. Plaintiffs first point to PP & L's use of grants, model homes, and cooperative advertising to foreclose competition. Plaintiffs also note that

PP & L's director of marketing wrote, in an October 1989 paper titled "Division Operations Strategic Planning Conference:" "Are less profitable market segments valuable if they help block the competition's market development? Through a multi-market electric heat strategy, PP & L has limited the extension of gas lines, thus increasing sales in all segments." (Pl.'s Ex. 27 at 2). Plaintiffs consider this statement indicative of PP & L's intent to forgo profits in an effort to foreclose competition.

Plaintiffs' expert's report suggests that the following illustrates PP & L's intent to monopolize: (1) the exclusionary nature of the all-electric agreements; (2) marketing documents calling for the establishment of a strike force to counter competitive threats; (3) furnishing low-interest loans to homeowners willing to replace existing gas or oil systems with electricity; (4) PP & L documents describing grants and advertising subsidies as promotional incentives designed to block gas extensions into new developments and displace less costly competing sources of heat; and (5) an internal PP & L document stating "we are experiencing some of the highest saturation rates in the nation," stating PP & L enjoyed "an overall 85% saturation," and warning against "rapidly increasing competition from gas utilities and oil companies in the new home market." (Def.'s Ex. 22 at 8–16).

The expert concluded *inter alia* that PP & L aimed to increase market share, "even if the added growth did not meet its normal rate of return" because, in the words of a PP & L employee, "marketing is here to stay ... I don't think we will ever return to the conservation days." (Def.'s Ex. 22 at 24). Plaintiffs' expert also believes PP & L relied on residential heating as a major opportunity

5. Plaintiffs' expert's report refers to documents revealing PP & L's intent to maintain or increase market share. These documents state that (1) PP & L aimed for saturation levels of 85% for single homes and 75% for apartments; (2) programs were needed to improve saturation results; "[3] our efforts in the first 3 years have been in the new construction market and we have taken total saturation of electric heat from 61% to 84% in 1986.... [T]here are 750,000 homes in our service area with fossil fuel systems as the only potential market which can add significantly to

... growth;" "[4] the only market which has significant potential above what we are presently addressing is the residential conversion market;" the heat pump program was proposed "to maintain our market share and counter anti-heat pump efforts by the gas and oil companies;" (5) PP & L needed to obtain a higher heat saturation in new construction; and "[6] competition in the residential heating market has intensified and PP & L must expand marketing efforts for the electric heat pump to achieve market share goals." (Def.'s Ex. 22 at 20–23).

to achieve growth and market penetration and that PP & L "attempted to achieve its goals by excluding competition even though affirmative methods of home heating were more cost effective." *Id.*

PP & L characterizes Plaintiffs' proofs, specifically the statements made by PP & L employees, as *nothing more than marketing rhetoric*, pointing to *Advo*, 51 F.3d at 1199 (interpreting the statements "[1] the ultimate benefit of the TMC program was that [defendant] would be the 'one stop buy,' i.e., the only competitor left, in the eight county Philadelphia market when rates would become 'upwardly adjustable'" and "[2] when you see the competition drowning, stick a water hose down their throat" as "isolated and unrelated snippet[s]" of "colorful, vigorous hyperbole" that "[t]he antitrust statutes do not condemn"). Any attempts to increase market share, argues PP & L, were both expected and lawful. *See id.* (remarking that firms "would try, as a first step, to wrest one or more of the[ ] large accounts away from [plaintiff]. [Defendant's] proposals to [plaintiff's] largest customers are exactly what we'd expect from a legitimate competitor. That such behavior might be consistent with predation does not mean that [plaintiff] can survive [defendant's] motion for summary judgment").

PP & L reminds the Court that the 84% market share figure discussed referred only to *new* homes and not *all* homes in PP & L's service area. Furthermore, PP & L's share of new homes has eroded since 1986, and its share of the entire residential market is below Plaintiffs'. According to PP & L, a regulated utility lacks any motivation to monopolize a market; once monopolized, it could not raise prices without PUC approval. In the past, PP & L has received PUC approval with sporadic success. PP & L points to the deposition of the PP & L employee explaining the "total dominance" remark: "[I]t's marketing talk for aggressive marketing to—to compete strongly in a highly competitive marketplace and to strive for success [not seeking 100% of the market]." (Def.'s Ex. 93 at 90). Finally, attacking the restrictive covenant in the property deeds,

PP & L notes that the deeds are dated 1966 and only ran for 10 years. (Pl.'s Ex. 53).

The Court finds that the statements proffered in the instant case provide stronger intent evidence than those evaluated in *Advo*. While *Advo* involved remarks appropriately characterized as nothing more than "aggressive" and "marketing rhetoric," those comments spoke of economic benefits and were couched in motivational statements. By contrast, the record here contains statements reflecting a strategy of total domination of the residential heating market made by an employee of a monopoly with the financial resources to effectuate that objective. These statements reveal a shift in general policy from a conservationist approach in the late 1970s to an aggressive marketing approach in the mid 1980s that sought an increase in usage. Moreover, the remarks were uttered at a point in time when PP & L controlled a major segment of the new residential construction submarket, and their exclusionary language pertains to *all* companies competing in the residential fuel market as opposed to a specific and isolated competitor. *See Syufy Enter. v. American Multicinema, Inc.*, 793 F.2d 990, 999 (9th Cir.1986) (finding "[a]lthough Mr. Syufy's remarks to Mr. Durwood are arguably consistent with a simple desire to succeed in free and open competition, the jury could reasonably have inferred a specific intent to monopolize from the threat to run AMC out of town"), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 838 (1987).

While the Court considers the statements presented more inculpatory and virulent than those examined in *Advo*, it concedes that other cases finding a specific intent to monopolize contained even stronger direct evidence. *See Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F.Supp. 1250, 1271–72 (E.D.Pa.1987) (finding specific intent evidence through (1) statements that defendant wanted to "take the competition out" and "then increase price" in a "basically noncompetitive atmosphere;" (2) the non-discovery of documents wherein defendants "considered the antitrust consequences" of their actions; (3) evidence defendants knew their conduct would implicate antitrust concerns;

and (4) evidence defendants engaged in pre-acquisition considerations of how defendant would raise prices after the commission of predatory acts). In the case *sub judice*, the aforementioned statements, without more, provide only marginal direct evidence of a specific intent to survive a motion for summary judgment. Accordingly, the Court searches for indicia of anticompetitive or exclusionary conduct as indirect, corroborating evidence of specific intent to supplement the direct evidence proffered. The Court therefore defers ruling on the specific intent issue until it considers the predatory conduct prong of the attempted monopolization elements. *See Conoco, Inc. v. Inman Oil Co., Inc.*, 774 F.2d 895, 905 (8th Cir.1985) (stating "isolated statements by a single Conoco official ... whose primary function was to advance WCO's competitive position, are insufficient to prove Conoco's intent to monopolize in the absence of corroborating conduct"); *Ashkanazy v. I. Rokeach & Sons, Inc.*, 757 F.Supp. 1527, 1536 (N.D.Ill.1991) (concluding "[a]lthough fairly virulent, these statements, without more, do not give rise to a reasonable conclusion that Rokeach intended to monopolize—as opposed to gain a larger share of—the relevant market, and therefore we reserve judgment on the specific intent issue until we consider evidence of anticompetitive conduct").

### (b). Predatory Conduct

Plaintiffs substantiate their allegation of predatory and anticompetitive conduct by looking to the all-electric agreements, cash incentives, and other activity. The all-electric agreements, argue Plaintiffs, used grants, model homes, cooperative advertising, and no supplementation clauses to insure the installation of equipment, i.e., the heat pump, that required a permanent source of electricity. Many of these agreements provided the cash grants in advance, and, according to Plaintiffs, PP & L designed these agreements to block the use or extension of fossil fuel in new residential developments. (Pl.'s Ex. 38; Ex. 65).

Plaintiffs also maintain that PP & L obtained agreements from builders stating that, in exchange for cash grants, the builders would refrain from installing gas line extensions. PP & L also reimbursed builders for trenching and backfilling costs. (Pl.'s Ex. 39; Ex. 64 (referring to agreement with "developer whereby he would not extend the gas lines beyond the first home, that has already been committed, if [PP & L] would reimburse him the cost of his trenching and backfilling")). Plaintiffs suggest that builders also resisted homeowners' efforts to install sources of heating other than the heat pump. (Pl.'s Ex. 94 at ¶ 4). Plaintiffs characterize this activity as predatory, designed to increase market share and not to produce superior efficiency, pointing to *Aspen*, 472 U.S. at 605, 105 S.Ct. at 2859 (noting "[i]f a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory").

PP & L protests that its lack of market power and its inability to coerce buyers prevents the all-electric agreements from violating the antitrust laws. The all-electric agreements, notes PP & L, affected only 120 out of 1,500 potential developments and had no effect on 85% of the new homes built from mid–1981 through 1995 in PP & L's service area. (Def.'s Ex. 24 ¶ 24). PP & L points to Plaintiffs' deposition testimony that competition would not be restricted if 80% of the market was available. (Def.'s Ex. 70 at 203–04; Ex. 72 at 278–79).

According to PP & L, the all-electric agreements constituted nothing more than legal and permissible discounts made on the condition that the buyer use PP & L's product; PP & L relies on *Advo*, 51 F.3d at 1203 & n. 13 (finding discounts based on the total amount of advertising purchased by a customer, in conjunction with defendant's failure to threaten to deny services to refusing customers, did not "offend antitrust principles," especially where plaintiff offered the same discounts). PP & L also notes that both Plaintiffs and UGI offered similar agreements with developers. (Def.'s Ex. 49 ¶ 14(c) (mentioning program whereby UGI agrees to extend gas mains in exchange for non-written agreement from developer that gas usage would justify this investment); Ex. 81 at 128 (referring to program where in return for free use of the oil tank, the customer had to

purchase all their heating oil from that specific company)).

The evidence, maintains PP & L, reveals that the all-electric agreements did not prevent builders and developers from offering, choosing, or installing heating systems other than electric; PP & L did not penalize the builders who installed alternative heating systems in violation of the all-electric agreements by withholding electric service; developers agreements with PP & L reflected the developers' own choices; and consumers felt no impact from the agreements because builders constructed "what buyers wanted." (Def.'s Ex. 29 at 39; Ex. 31 ¶¶ 4(f), 8; Ex. 32 ¶¶ 4(a), 6; Ex. 33 ¶ 12; Ex. 34 ¶¶ 6, 7; Ex. 35 ¶ 5(n); Ex. 36 ¶ 3(a); Ex. 39 ¶ 4; Ex. 40 ¶¶ 2–4; Ex. 41 ¶¶ 6–8; Ex. 42 ¶¶ 4, 10; Ex. 44 ¶¶ 3(g), 5). PP & L blames Plaintiffs' inability to effectively compete for new residential development business on their failure to aggressively and competently market oil heat. PP & L points to deposition testimony that Plaintiffs did not know the identity of many of the builders or developers in their area. (Def.'s Ex. 31 ¶¶ 7, 8; Ex. 38 ¶ 6; Ex. 39 ¶ 13; Ex. 68 at 277–82; Ex. 70 at 193–94; Ex. 79 at 236–39; Ex. 80 at 243–48; Ex. 83 at 235–43; Ex. 85 at 212–14; Ex. 89 at 185–93).

PP & L proffers legitimate explanations for the "no supplementation" clause: it allowed PP & L to recoup its investment in the grant program, and rate payers experienced increased benefits from the utilization of off-peak capacity. PP & L notes that Plaintiffs do not sell supplementary heating systems, and customers do not request them because of their high costs, i.e., the construction of a chimney for installation, and disadvantages associated therewith, such as reliability of supply, dirt, smell etc. (Def.'s Ex. 8 at 140–41; Ex. 11 at 216; Ex. 25 at 18–19; Ex. 27 at 61; Ex. 29 at 67–68; Ex. 45 ¶¶ 3–4; Ex. 46 ¶ 3; Ex. 47 at ¶¶ 3, 6; Ex. 48; Ex. 74 at 88).

PP & L describes Plaintiffs' allegations as disguised complaints about the competitiveness of PP & L's legitimate marketing efforts, size, efficiency, and resources. According to PP & L, Plaintiffs have the same advance notice of new home developments but choose not to take advantage of it. To effectively market electric heating to builders and developers, PP & L personnel relied on nothing more than personal communication, attendance at land use planning meetings, systematic review of the newspaper, and other similar means. (Def.'s Ex. 3; Ex. 5 at 438–39; Ex. 6 at 11; Ex. 25 at 22–23; Ex. 70 at 196–98; Ex. 74 at 100–04; Ex. 75 at 105; Ex. 77 at 167; Ex. 78 at 173; Ex. 87 at 72–73). PP & L maintains it created "CEPHPA" for the pro-competitive purpose of increasing the quality of heat pump installations and customer satisfaction, and CEPHPA never denied membership to any Plaintiff. (Def.'s Ex. 11 at 214–16; Ex. 12 at 127–28; Ex. 67; Ex. 77 at 93–94). Finally, PP & L contends that the 30 year old deed restrictions covered a meager 51 building lots for a 10 year period.

■ "Predatory or anticompetitive conduct is that which unfairly tends to be exclusionary or tends to destroy competition." *Great W.*, 63 F.3d at 1385. *See also Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 541 (7th Cir.1986) (remarking "[p]redatory conduct may be broadly defined as conduct that is in itself a violation of the antitrust laws or has no legitimate business justification other than to destroy or damage competition"); *Aurora Enter. v. National Broadcasting Co., Inc.*, 688 F.2d 689, 695 (9th Cir.1982) (defining predatory conduct to include "conduct amounting to a substantial claim of restraint of trade or conduct clearly threatening to competition or exclusionary"). The question of whether the Court may consider conduct exclusionary "cannot be answered by simply considering its effect on [plaintiff]. In addition, it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way." *Aspen*, 472 U.S. at 605, 105 S.Ct. at 2858–59.

Viewing the submissions in the light most favorable to Plaintiffs, the Court finds evidence of conduct that a jury could consider predatory. Here, a monopolist with enormous financial resources persuaded builders and developers to exclude competing sources of heat through aggressive marketing strategies that involved cash incentives, advertising promotions, and advance notice of new con-

struction. PP & L targeted builders knowing they are the primary decision makers regarding the installation of heat systems in new homes and entered into exclusive dealing arrangements with them that may have violated § 1 of the Sherman Act. As the sole provider of electricity, the all-electric agreements translate into "all-PP & L" agreements and guarantee PP & L a steady stream of future cash flow. These all-electric agreements applied to both new homes and any existing homes that the builders developed.

PP & L essentially used its position to establish itself as a major force in the new construction market by excluding others on some basis other than superior efficiency. Consumers suffered from this conduct because PP & L locked new homeowners into inefficient and expensive sources of heat, restraining their ability to obtain less-costly and more efficient heating systems.

Revisiting the question of specific intent, the Court concludes that the aforementioned statements could convince a jury that PP & L intended to dominate the new residential heating submarket, that PP & L advanced that intent, and that the all-electric agreements codified PP & L's desire to dominate and assisted in the realization of that objective. When considered in conjunction with exclusionary conduct, a jury could conclude that the aforementioned statements evince PP & L's specific intent to monopolize the residential heating of new homes.

The different interpretations of market trends and economic performance proffered by the parties reveal genuine issues of material fact concerning both the presence or absence of specific intent and the character, either predatory or competitive, of the conduct designed to actualize that intent. For example, a jury could reach two different factual conclusions regarding PP & L's choice to implement the all-electric agreement program in 1987 after achieving an 84% share of the new construction submarket in 1986: (1) PP & L aimed to dominate the new construction submarket; or (2) PP & L had to increase the virulence of its marketing programs to counter fierce competition from rapidly expanding gas companies. Accordingly, the Court finds genuine issues of material fact with regard to the special intent and predatory conduct elements of Plaintiffs' attempted monopolization claim.

### (c). Dangerous Probability of Success

■ Evaluation of an attempted monopolization claim also involves a finding of a dangerous probability of achieving monopoly power. This determination requires an "inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Pastore v. Bell Tel. Co. of Pennsylvania,* 24 F.3d 508, 512–14 (3d Cir.1994) (remarking "the law directs itself to conduct which unfairly tends to destroy competition itself.... [Section] 2 makes the conduct of a single firm unlawful only when it actually monopolizes or dangerously threatens to do so") (citation omitted). *See also Great W.,* 63 F.3d at 1385 (stating "[d]angerous probability of achieving an actual monopoly position is customarily assessed by looking at the defendant's market share. If the defendant possesses a large share, it will likely be concluded that the defendant's conduct, if undeterred, will result in an actual monopoly"); 3 Von Kalinowski, *Antitrust Laws and Trade Regulation* § 20.01[5] (1996) (remarking "[i]n deciding whether there is a dangerous probability of success, courts analyze the defendant's market share in light of the market structure") (citation omitted) ("Von Kalinowski").

### (i). The Relevant Market

■ In order to determine the dangerous probability of monopoly power, the Court must first establish the definition of the relevant market. Plaintiffs bear the burden of defining the relevant market. *Pastore,* 24 F.3d at 512. The relevant product market consists of "commodities reasonably interchangeable by consumers for the same purposes. Factors to be considered include price, use and qualities. Accordingly, the products in a relevant product market would be characterized by a cross-elasticity of demand." *Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 198–99 (3d Cir. 1992) (citations omitted), *cert. denied,* 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677

(1993). *See also SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir.) (describing the relevant product market as "those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other"), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). Courts also examine the relevant "geographic" market that includes "the area in which a potential buyer may rationally look for the goods or services he or she seeks." *Pennsylvania Dental*, 745 F.2d at 260 (citation omitted). Within the relevant market, a "submarket" may exist, "evidenced by such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Pastore*, 24 F.3d at 513 (citation omitted).

▆▆▆▆ Market definition presents a question of fact for jury resolution that the Court may resolve on a motion for summary judgment if the record does not present any material factual disputes. *See Town Sound*, 959 F.2d at 497 (Sloviter J., concurring and dissenting) (remarking "[a]lthough plaintiffs are correct that the scope of the relevant market may be a question of fact for jury resolution, in this case they may have failed to create a material factual dispute") (citations omitted); *Weiss v. York Hosp.*, 745 F.2d 786, 825 (3d Cir.1984) (remarking "[m]arket definition is a question of fact and we therefore must affirm the jury's conclusion unless the record is devoid of evidence upon which the jury might reasonably base its conclusion") (citations omitted), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985); 3 Von Kalinowski § 19.02[2] (remarking that the definition of a relevant market may be decided on summary judgment if the moving party satisfies Rule 56 requirements *and* "shows its market theory describes the actual market behavior so accurately that the nonmoving party's assertion of the moving party's market power if not implausible, is at least unreasonable. The Supreme Court has defined this burden as substantial"). Similarly, whether a sub-market exists presents a factual dispute for jury resolution. *See Case–Swayne Co., Inc. v. Sunkist Growers, Inc.*, 369 F.2d 449, 456 (9th Cir.1966) (stating "there may be a well-defined submarket which constitutes the relevant market for antitrust purposes which ... is a question of fact in the particular case"), *rev'd on other grounds*, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967).

Plaintiffs and PP & L agree that the relevant product and geographic markets can be defined as the market for residential heating and related equipment within PP & L's service area, approximately 1,074,015 homes. (Pl.'s Ex. 52). (*Compare* Def.'s Ex. 22 at 55) (Plaintiffs' expert's report defining the relevant market as "the heating fuel market within that portion of Central Eastern Pennsylvania comprising of PP & L's service area") *with* (Def.'s Ex. 24 ¶ 58) (PP & L's expert's report defining relevant market as "the market for residential heating fuel within PP & L's service area"). Plaintiffs, however, characterize the new housing market as a submarket, claiming that both the public and industry recognize it as a submarket. A high cost of conversion, argue Plaintiffs, prevents existing homes from changing heat sources. (Pl.'s Ex. 10 at 63–66; Ex. 26; Def.'s Ex. 22 at 26). PP & L objects to Plaintiffs' description of the new residential heating market as a "submarket," arguing that Plaintiffs' expert refused to define it as such. (Pl.'s Ex. 10 at 55–56 (stating, during a deposition, that the market for heating fuel in newly installed residences is a significant segment of the overall market "so long as you don't mean submarket by 'segment' ")). Accordingly, genuine issues of material fact exist as to whether the new home market qualifies as a submarket.

Viewing the submissions in the light most favorable to Plaintiffs suggests to the Court that the new home market does constitute a submarket. PP & L's position is inconsistent with its marketing initiatives. PP & L initiated "Residential New Home Marketing Programs;" designed "Four–Star Home Programs" to respond "[a]s the competition with gas and oil intensifie[d] in the new home market;" dedicated its residential marketing program between 1982 and 1988 to encourag-

ing "the installation of off-peak space and water heating installations into new homes;" divided its residential strategy into two categories, "New Homes" and "Existing Homes;" strategized methods for increasing saturation in "new house construction;" developed marketing proposals for "New Construction" and "Conversions;" and targeted new "developments." (Pl.'s Ex. 22; Ex. 24; Ex. 25; Ex. 26; Ex. 43; Ex. 49; Ex. 54; Ex. 55; Ex. 61; Def.'s Ex. 60). *But see* Pl.'s Ex. 48 (PP & L memorandum referring to "New Dwelling Units" as a "market segment"). Others in the industry recognize the "new residential construction" submarket, including the PUC. (Pl.'s Ex. 56 (PUC report dividing its analysis of PP & L promotional techniques between "New Construction" and "Conversions")).

Furthermore, the high costs associated with converting an existing heating system suggest that new residences present a unique submarket. The marketing programs targeting existing homes differ dramatically from those designed to encourage the installation of a system in a new home because of the different concerns each implicates. Those programs seeking to convert existing homes face a more difficult task than those aiming to install new systems. In the former, the customer incurs substantial costs associated with the conversion in addition to the monies expended for the system itself, while in the latter, the consumer bears only the cost associated with the system. Once the customer chooses a new system, it becomes an attached fixture to the home, i.e., an installed heat pump, furnace, etc., and conduits are installed to transmit the heat through the home, i.e., vents, radiators, etc. Unlike either gas or electric heat, the installation of oil heat requires the construction of a chimney. Should the homeowner choose to convert the existing system, he or she must remove the heating unit and possibly the conduits compatible with that system. (Pl.'s Ex. 26 (PP & L position paper remarking "[r]eaching the conversion customer at the time the decision is made to replace a heating system is very difficult. Promotional efforts must be broad based and thus expensive per contact"); Ex. 54 (PP & L report stating "[h]ow well an older home, which

previously used fossil fuel, can be retrofitted to use electric as a heat source is also a troubling question"); Ex. 95 (affidavit of customer dissatisfied with electric heat but wary of high conversion costs)). Thus, targeting new residential construction allows the supplier to "get in early" when the consumer need not consider the costs of conversion in making a decision. Prohibitive conversion costs essentially remove an existing home from the relevant market.

 Plaintiffs have proffered sufficient evidence to support a finding that the new residential market constitutes a submarket and thereby create a genuine issue of material fact. The Court now assess whether PP & L possessed enough monopoly power to come dangerously close to success within the relevant market and submarket. In the absence of a formula for reaching this decision, several factors emerge: "[1] the strength of the competition, [2] probable development of the industry, [3] the barriers to entry, [4] the nature of the anticompetitive conduct, and [5] the elasticity of consumer demand. Most significant, however, is the defendant's share of the relevant market." *Pastore,* 24 F.3d at 513 (citations omitted). *See also* 3 Von Kalinowski § 20.01[5] (remarking that "market share alone may not suffice to demonstrate a dangerous probability of success" and listing other factors including barriers to entry, relative size of defendant, and "whether the defendant's market share is rising or declining").

### (ii). Market Share

 A dangerous probability of monopoly power exists where "the defendant firm possesses a significant market share when it undertakes the challenged anticompetitive conduct." *Barr Lab., Inc. v. Abbott Lab.,* 978 F.2d 98, 112 (3d Cir.1992) (citation omitted). Nonetheless, while "the size of a defendant's market share is a significant determinant of whether the defendant has a dangerous probability of successfully monopolizing the relevant market, it is not exclusive." *Id. See also Pastore,* 24 F.3d at 513 (remarking "[there is a] presumption that attempt does not occur in the absence of a rather significant market share").

Plaintiffs submit that PP & L's share of the relevant market suggests that monopolization could result. The percentage has increased every year for the past 19 years without interruption, from 18.19% in 1977 to 31.03% in 1995. According to Plaintiffs, no single oil dealer holds more than a 1.4% share of the market, and Plaintiffs collectively have less than a 6% share of the market. (Pl.'s Reply Mem. at 17 n. 10–11; Ex. 96). Plaintiffs also point to PP & L's share of the new housing submarket, which reached 84% in 1986 and averaged 70% between 1987 and 1995, describing PP & L's position in this submarket as "dominant."

PP & L protests that 69% of consumers have chosen other sources for home heating. (Def.'s Ex. 24 ¶¶ 34, 69; Ex. 23 at 230). PP & L notes that more homes in the relevant market were heated by oil, 380,463 homes, than by electricity, 333,317 homes. (Def.'s Ex. 14; Ex. 20 at 4). PP & L stresses that its share of the new home submarket has fallen steadily over the past decade, from 84% in 1986 to 53% in 1995. According to PP & L, only 21% of the new homes built received construction grants, leaving 79% unaffected, and PP & L's attempts to covert oil and gas customers to electric heat have been unsuccessful. (Def.'s Ex. 4 at 122–23; Ex. 17; Ex. 23 at 495; Ex. 24 at ¶¶ 72, 108). PP & L attributes the rise and fall of its share of the new home market from the late 1970s through 1995 to the fluctuating competition from gas companies. The PUC's removal of the gas ban in the mid 1980s— which eliminated gas utilities as strong competitors in the late 1970s—led to an increase in the market share of gas utilities at the expense of PP & L. In its own service area, UGI's share has grown from 12% in 1987 to over 50% in 1995.

 The Court considers PP & L's 31% market share alone inadequate to demonstrate, as a matter of law, that PP & L possessed sufficient market presence to come dangerously close to achieving monopoly power. A market share of 31% is not significant enough, without more, to create a conclusive presumption of attempted monopoly. *See Barr*, 978 F.2d at 112 (remarking "market share of 47–50% alone [is] not enough to

establish dangerous probability of success") (citation omitted); 3 Von Kalinowski § 20.01[5] (stating "[c]ourts will typically be able to find a dangerous probability where defendants have a 50% or more share. Defendants with shares less than 30% are rarely determined to possess a dangerous probability. Those with a share between 30 and 50 will have a dangerous probability if other factors are present") (substantiating with case law). Therefore, the Court proceeds to examine the other factors.

### (iii). Pricing

Plaintiffs suggest that PP & L's monopoly power is demonstrated by the inflated prices it obtains in the heating fuel market. As a heating fuel, PP & L prices electricity 40% higher than fossil fuel when heat pumps are used and more than 2½ times the price of fossil fuel when electric baseboard heating is used. (Pl.'s Ex. 23) (PP & L document listing respectively the following costs per 1,000 sq. ft.: coal ($182), natural gas ($230), oil ($240), electric heat pump ($334), electric baseboard ($651), heat pump plus ($221), and ceramic storage heaters ($430)); Ex. 26 (document listing cost per Btu for gas ($8.10), oil ($7.70), electric baseboard ($22.50), heat cycle heat pump ($11.20), ceramic heating ($11.70), and heat pump plus ($7.50)); Ex. 48 (listing cost per million BTU for electric baseboard ($22.56), heat pump ($13.67), heat pump plus ($12.77), ceramic ($13.77), conventional oil ($11.07), pulse oil ($8.70), conventional gas ($11.40), and pulse gas ($8.56))). Plaintiffs suggest that the low rate associated with the heat pump plus system is misleading and inaccurate. (Pl.'s Ex. 87). Plaintiffs maintain that PP & L extracts a supracompetitive price for a heating system that does not present a more desirable alternative to gas or oil. (Pl.'s Ex. 76; Ex. 77; Ex. 94; Ex. 95 (affidavits of dissatisfied customers of electric heat)). Finally, according to Plaintiffs' expert, "a competitive market is characterized by price elasticity. The ability to increase market share in the face of increasing price disadvantage is the antithesis of a competitive market." (Def.'s Ex. 22 at 29).

PP & L maintains its prices have remained stable for almost a decade between 1985 and

1995 with no general rate increase. (Def.'s Ex. 24 ¶ 82). PP & L also notes that the PUC regulates its prices. Furthermore, PP & L's expert suggests that other factors, like the superiority of electric heating, contribute to PP & L's ability to increase market share in spite of higher prices. (Def.'s Ex. 24 at ¶ 89).

### (iv). Barriers To Entry & Competition

Plaintiffs claim that substantial barriers to competition exist in this field. Plaintiffs remind the Court that both PP & L and UGI, as exclusive suppliers of electric and natural gas respectively, hold monopoly positions in this market that allow them guaranteed profit streams once the subsidized heating systems are installed. (Pl.'s Ex. 40) (comparative analysis of "payback calculations" for heat pumps installed). The high cost of installing or converting a heating system insures that once the homeowner has selected a heating system, the probability of the homeowner changing that system is small. Plaintiffs complain of stringent competition in a market saturated with fuel dealers, all of whom sell at competitive prices. Plaintiffs must do more than offer efficient systems that cost less; they need to overcome the additional barrier of high installation and conversion costs. Furthermore, with sales of roughly $2.7 billion, PP & L is about 400 times the size of the average oil dealer. (Pl.'s Ex. 5 at 182). PP & L's expert's report corroborates this position. (Pl.'s Ex. 22 at 26).

Plaintiffs suggest that PP & L also enjoys exclusive and unlimited access to the builder market, and the builder chooses the type of heating system installed in a new home 85% of the time. This access usually begins long before Plaintiffs receive public notice of new construction, enabling PP & L to obtain early commitments. (Pl.'s Ex. 6 at 247–51; Ex. 8 at 218–19; Ex. 59). According to Plaintiffs, PP & L shifts costs to its regulated activities, those which, by nature of PP & L's status as regulated utility, are guaranteed to return a reasonable profit that is recovered from rate-payers. This enables PP & L to lower prices in the unregulated market. Similarly, argue Plaintiffs, PP & L applies advantages it en-joys in the regulated market, like the "customer service department"—whose salaries are paid by the rate-payers—to arrange electric service for builders and developers. (Pl.'s Ex. 3 at 17 (deposition revealing marketing was referred to customer service); Ex. 25 (referring to oil and gas companies' inability to match the depth of PP & L's personnel)). Finally, Plaintiffs describe PP & L's mention of the resurgence of UGI's competitiveness as a red herring, noting UGI's rapid and substantial increase in market share occurred within its own service area, which differs from PP & L's service area.

PP & L characterizes the barriers to entry in the home heating market as low, maintaining that participation requires neither sophistication, patents, large capital expenditures, storage tanks, nor government approval. (Def.'s Ex. 23 at 108; Ex. 24 at ¶¶ 77–79 (expert opinion corroborating PP & L's position); Ex. 67 at 68–77; Ex. 69 at 27–28, 50; Ex. 72 at 23; Ex. 75 at 32; Ex. 77 at 56–59; Ex. 79 at 43; Ex. 83 at 34; Ex. 87 at 25; Ex. 90 at 49; Ex. 91 at 22). PP & L points to other court decisions in similar industries that found no significant barriers to entry, referring specifically to *United States v. Empire Gas Corp.*, 537 F.2d 296, 305 (8th Cir.1976) (noting that in the liquid petroleum retail gas business, "barriers to entry in this industry are minimal; all that are needed are a supply of [liquid petroleum], a truck, and perhaps a storage tank"), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). PP & L describes the competition as strong, well capitalized, and lucrative, noting UGI has assets of more than $2 billion and revenues of $877 million, PECO has assets of $14 billion and revenues of $4 billion, Plaintiff SICO earned over $400 million in revenues in 1995, and PG Energy enjoyed 1995 revenues of $152.8 million. (Def.'s Ex. 49 at Exhibit A; Ex. 64 at 20, 22; Ex. 65).

### (v). Probability Conclusion

The submissions on both sides of this question have created a genuine issue of material fact for jury resolution of whether a dangerous probability exists that PP & L could

achieve monopoly power in the relevant market and submarkets. The Court finds evidence suggesting, if credited, that such a probability exists. PP & L's 31% share of the relevant market is an insufficient indicator on its own. When considered in conjunction with other factors, however, the 31% market share suggests a possibility of achieving monopoly power. A jury could find PP & L's significantly larger share of the new construction submarket especially indicative of monopoly power in light of the fact that the majority of the charged predatory conduct involves PP & L's marketing strategies for this submarket. Entering into this consideration would be the issue of supracompetitive pricing. Plaintiffs describe PP & L's prices as anticompetitive while PP & L suggests other factors play a role in the selection of a heating system.

 · The parties also diverge on the issue of barriers to competition. Entry barriers refer either to "long run-costs that were not incurred by incumbent firms but must be incurred by new entrants or [to] factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427–28 (9th Cir.1993), *cert. denied*, 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). *See also Southern Pac. Communications Co. v. American Tel. and Tel. Co.*, 740 F.2d 980, 1001 (D.C.Cir.1984) (defining barrier to entry as "[a]ny market condition that makes entry more costly or time-consuming and thus reduces the effectiveness of potential competition as a constraint on the pricing behavior of the dominant firm"), *cert. denied*, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985). In the actual case, the Court finds sufficient evidence in the submissions to justify a jury finding that this industry suffers from high entry barriers.

Evidence that while PP & L's prices exceed those of the competition, its market share consistently increases, could convince a jury that the relevant market contains insufficient competition to restrain PP & L from earning monopoly returns. PP & L points to two cases from the Third Circuit suggesting that capital requirements of a few million dollars do not create barriers to entry. *See Advo*, 51 F.3d at 1200–1201 (finding no barriers to entry of pre-printed advertising circular market; describing a start up investment of "a couple of million dollars" as "not so high that it would prevent new competitors from jumping in if [defendant] tried to charge supracompetitive prices"); *Barr*, 978 F.2d at 113–14 (finding low barriers to entry in pharmaceutical drug market).

 Concededly, the record in the instant case does not contain evidence of prohibitively high costs associated with entering this industry. Instead, the Court chooses to employ an expansive definition of "barriers to entry" more suitably tailored for the unique facts presented, looking to "(1) legal licenses; (2) control over a superior resource; (3) entrenched buyer preferences for established brands or company reputations; and (4) capital market evaluations imposing higher capital costs on new entrants." *Los Angeles*, 6 F.3d at 1428 n. 4 (citation omitted). *See also Southern Pac.*, 740 F.2d at 1001 (including "the costs and delays of the regulatory process .... the creation of bottlenecks, entrenched customer preferences ... large capital requirements, access to technical information, and disparities in risk" in definitions of barriers to entry) (citation omitted).

The Court's conclusion rests, in part, on the uniqueness of the residential heating market in PP & L's service area. The two largest players in this market are regulated monopolies who face no competition within their respective fields. PP & L provides the *exclusive* source of electric energy in Plaintiffs' service area, and the barriers to entry in the electric supply arena are absolute. If PP & L decides to raise rates, and the PUC approves this decision, PP & L will not be checked by the entry of different suppliers of electricity willing to charge a lower price. Once arrangements are made for a particular home to have either gas or electric, either UGI or PP & L is assured the revenue stream from that home and rests comfortably knowing that no competitor selling gas or electricity will wrestle that client away; "all-electric" and "all-gas" mean "all-PP & L" and "all-UGI."

The remainder of the market consists of small fuel oil dealers, some of whom have limited financial resources. Plaintiffs strive to compete in a market populated by two well endowed and heavily regulated monopolies. Anyone wishing to enter the unregulated portion of the residential heating market is thrown in among the fuel oil dealers. While the costs associated with entering the market may not be prohibitive, the high level of competition among the regulated monopolies and the fragmented fuel oil dealers could prevent entrants from restraining PP & L.[6]

Finally, the high conversion costs associated with changing heating systems insures that once a home contains a particular system, the supplier can count on consistent revenue from that house. These high conversion costs limit the customers' options, lessen the probability that a new competitor will succeed, and increase the importance of the new residential construction submarket. The "permanence" of an existing system makes the new construction submarket crucial to the economic sustenance of the competitors in the relevant market, and the inability to access this submarket has deleterious effects on Plaintiffs' competitiveness in the relevant market. The Court therefore finds ample evidence in the record to create a factual issue as to whether near monopolization of the new construction submarket yields a high probability that PP & L could successfully monopolize the entire residential market.

Accordingly, in the face of jury questions regarding an intent to monopolize, a dangerous probability of achieving monopoly power, and predatory conduct, the Court cannot award summary judgment on Plaintiffs' attempted monopolization claim. (*Compare* Def.'s Ex. 22 at 4–7 (Plaintiffs' expert claiming the presence of monopoly power), at 7–24 (finding evidence of specific intent), at 30

(describing PP & L's activity as "anticompetitive") *with* Def.'s Ex. 24 at ¶¶ 58–88 (PP & L's expert proclaiming PP & L has no market power), at ¶¶ 117–23 (denying specific intent to monopolize), at ¶¶ 83–88 (denying PP & L's conduct was predatory)). This claim will proceed.

### 2. Actual Monopolization

PP & L moves for summary judgment on Plaintiffs' claim of actual monopolization under § 2 of the Sherman Act. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of superior product, business acumen, or historical accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481, 112 S.Ct. 2072, 2089, 119 L.Ed.2d 265 (1992) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)). Plaintiffs must also establish that they suffered antitrust injury. *See Houser v. Fox Theatres Management Corp.*, 845 F.2d 1225, 1233 (3d Cir.1988) (remarking "plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants acts unlawful") (citation omitted).

### (a). Monopoly Power

Monopoly power is "the power to control prices or exclude competition." *United States v. E.I. DuPont De Nemours and Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). The Third Circuit examines these two factors conjunctively. *See Borough of Lansdale v. Philadelphia Elec. Co.*, 692 F.2d 307, 311 (3d Cir.1982) (defining monopoly power as the power to

---

**6.** The Court is not persuaded by PP & L's reliance on *Empire Gas*. While *Empire Gas* found low barriers to entry in the liquid petroleum retail gas industry, the Court considers the competitive forces unique to this relevant market dispositive. A finding contrary to *Empire Gas* from a different region suggests that concerns unique to the market in question control, and no established rule exists that a certain industry has low or high barriers to entry. The Court believes this finding varies from case to case. *See Oahu Gas Serv., Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 367 (9th Cir.) (finding sufficient evidence to support the "conclusion that high barriers to entry existed in the Hawaiian propane market"), *cert. denied*, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988).

control prices *and* exclude competition). "[T]he size of market share is a primary determinant of whether monopoly power exists." *Pennsylvania Dental,* 745 F.2d at 260 (citation omitted). *See also Fineman,* 980 F.2d at 201 noting monopoly power "may ordinarily be inferred from a predominant share of the relevant market" (citation omitted); *Weiss,* 745 F.2d at 827 (stating "[a] primary criterion used to assess the existence of monopoly power is the defendant's market share").[7]

▬ In the instant case, PP & L's share of the relevant market has climbed steadily from 17.30% in 1978 to 31.03% in 1995. The Court considers these figures inadequate. Under the decisions in this Circuit, a market share of 31% is insufficient as a matter of law to establish monopoly power. *See Ideal,* 90 F.3d at 749–50 (finding a 47% share inadequate); *Fineman,* 980 F.2d at 201 (finding as a matter of law that "absent other relevant factors, 55 percent market share will not prove the existence of monopoly power" and noting "90% is enough, 60% is not likely to suffice, and 33% is insufficient") (citation omitted); *Pennsylvania Dental,* 745 F.2d at 261 (finding a market share of between 32% and 35% insufficient as a matter of law to establish monopolization); 3 Von Kalinowski § 19.02[3] (remarking that lower courts find that a high market share "generally above 70% [ ] by itself demonstrates monopoly power. . . . [A] low market share (generally below 40%) either precludes a finding of monopoly power or requires a finding of no monopoly power. . . . In the middle range (generally 40% to 70%) courts have split over whether market share alone suffices to establish monopoly power").

▬ Because PP & L's share of the relevant market is insufficient to support a finding of monopoly power, the Court concludes as a matter of law that Plaintiffs cannot proceed on their claim for actual monopolization. The Court recognizes that in *Weiss,*

the Third Circuit remarked that courts have the discretion to examine other factors beyond market share in assessing monopoly power. That decision also instructs, however, that a 33% share of the relevant market is insufficient to find monopoly power. *See Weiss,* 745 F.2d at 827 & n. 72 (citations omitted). Finally, while the Court did not regard PP & L's 31% share as inadequate when evaluating the attempted monopolization claim, the threshold finding in an actual monopolization analysis is higher. *See* 3 Von Kalinowski § 19.03 (remarking that "the defendant crosses the 'dangerous probability' threshold with substantially less market share than the defendant who crosses the 'monopolization' portal"). The Court therefore grants PP & L's Motion for Summary Judgment with respect to Plaintiffs' claim of actual monopolization.

### 3. Monopoly Leveraging

▬ Plaintiffs charge PP & L with leveraging its monopoly power as the sole provider of electricity in violation of § 2 of the Sherman Act. Specifically, Plaintiffs maintain that PP & L had an excess of electricity from the Susquehanna nuclear facilities. According to Plaintiffs, if PP & L "sold that electricity to other utilities on the interchange, the proceeds of those sales would be used to reduce the energy cost rate which the PUC allowed it to recover." (Pl.'s Mem. Opp. at 48). Plaintiffs posit that if PP & L "could make sales to its jurisdictional ratepayers, the PUC would allow a return on the cost of those sales which increased PP & L's profits." (*Id.*) (*See* Pl.'s Ex. 9 at 51–53 (stating that PP & L used to achieve savings by making sales on the interchange that improved earnings but the PUC changed its position, requiring that any improvement in earnings position come from sales to customers); Ex. 22 at 2 (Plaintiffs' expert speculating "PP & L leveraged a regulated monopoly position" as an electric power provider in an

---

7. In assessing whether monopoly power exists, the Court applies the same definitions of relevant market and submarket crafted *supra* in the attempted monopolization analysis. *See* 3 Von Kalinowski §§ 19.02[2], 20.01[2][b] (1996) (stating "to determine if monopoly power exists, it is first necessary to define the relevant market in

which the power to control prices or and/or exclude competitors exists. . . . The same tests used to determine the relevant market in cases of actual monopolization are applied in attempted monopolization actions") (citing *inter alia Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993)).

attempt to monopolize the heating fuel market in its service area)). According to Plaintiffs, PP & L targeted the home heating market to increase revenues and profits, and PP & L used the all-electric agreements and other practices to obstruct the competition from entering that market.

PP & L attacks Plaintiffs' leveraging claim, relying exclusively on *Advo*. There, the Third Circuit refused a monopoly leveraging claim where the industry was marked by low barriers to entry, any attempt to recoup foregone profits would lead to a flood of new entrants in the market, the record contained no evidence of leverage, and defendants' offering of discounts did not offend antitrust practices. PP & L considers itself in a similar situation, maintaining the market has low barriers to entry, PP & L cannot raise prices because of the PUC, and the record contains no evidence of leveraging. (Def.'s Ex. 24 ¶¶ 114–16 (PP & L's expert denying leverage)). The Court disagrees.

 "Leveraging involves the use of monopoly power in one market to gain an advantage in another market," and the use of such power violates § 2 of the Sherman Act. 3 Von Kalinowski § 19.05[3]. The essence of a leveraging claim "is the use of monopoly power at one stage of production or in one market to gain a monopoly or a competitive advantage at another stage of production or in another, related market." *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 775 F.Supp. 536, 540 (N.D.N.Y.1991) (citations omitted), *aff'd*, 964 F.2d 186 (2d Cir.1992). *See also Eastman*, 504 U.S. at 480 n. 29, 112 S.Ct. at 2089 n. 29 (remarking "power gained through some natural and legal advantage, such as a patent, copyright, or business acumen, can give rise to liability if a seller exploits his dominant position in one market to expand his empire in the next") (citations omitted); *Robles v. Humana Hosp. Cartersville*, 785 F.Supp. 989, 996 (N.D.Ga.1992) (defining monopoly leveraging as the "use of power in one market to dominate or control a secondary market"). In this Circuit, Plaintiffs must show that PP & L gained more than a mere competitive advantage in the residential heating market. Rather, "in order to prevail upon a theory of monopoly leveraging, a plaintiff must prove threatened or actual monopoly in the leveraged market." *Fineman*, 980 F.2d at 206. *See also* 3 Von Kalinowski § 19.05[3][c] (adopting *Fineman* approach and suggesting "monopoly leveraging only should be an offense when the defendant has either monopolized the second market or obtained sufficient market power in it to be liable for attempted monopolization").

Plaintiffs' leveraging claim survives summary judgment. Accepting Plaintiffs' theory as true, the Court finds a genuine issue of material fact concerning whether PP & L targeted the home heating market both to increase revenue in the unregulated market and to offset its inability to broker out excess energy to other utilities under regulatory supervision. A jury, accepting the record as framed by Plaintiffs, could find that PP & L leveraged its monopoly power, attempted to monopolize a second market, and enjoyed more than just a competitive advantage in that second market.

*Advo* provides no support for PP & L. Unlike the market in *Advo*, the relevant market in the instant case contains high barriers to entry. The record demonstrates that PP & L enjoys a consistent, albeit small, increase in market share each year even though its heating systems, with the exception of the heat pump plus, are the costliest form of heat. To date, PP & L has not suffered a wave of new entrants driving prices down to competitive levels. Similarly, PP & L's status as a monopoly allows it to extract home heating higher prices without the fear that other competitors will enter the market. Once PP & L obtains an agreement from a builder that all homes in a development will be electrically heated, PP & L is guaranteed that all homes must look to PP & L for power. Finally, the marketing programs employed by PP & L in its attempt to monopolize the relevant market, unlike those in *Advo*, may very well offend antitrust principles.

## B. SHERMAN ACT § 1

 Section 1 of the Sherman Act provides: "**Trusts, etc., in restraint of trade illegal; penalty[:]** Every contract, combination in the form of trust or otherwise, or

conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C.A. § 1. In order to present a valid claim under § 1, Plaintiffs must prove "(1) the defendants contracted, combined or conspired among each other, (2) the combination or conspiracy produced anticompetitive effects within the relevant product and geographic markets; (3) the objects of the conduct pursuant to that contract or conspiracy were illegal; and (4) the plaintiffs were injured as a result of that conspiracy." *Ideal,* 90 F.3d at 748 n. 5 (citation omitted).

### 1. *Per Se* Illegality of the Contested Agreements

■■■■ Since "[v]irtually all business agreements restrain trade to some extent," § 1 of the Sherman Act "has been construed to make illegal only those contracts that constitute unreasonable restraints of trade." *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996) (citation omitted). Certain agreements, "because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. Such plainly anticompetitive agreements are illegal *per se*." *Id.* at 1367 n. 9. Examples of *per se* violations include tying agreements and group boycotts. *See Town Sound,* 959 F.2d at 476–77 (stating "[t]he Court long ago established a so-called 'per se' rule against tying arrangements in cases where it thought exploitation of leverage is probable") (citation omitted); *Miller v. Indiana Hospital,* 843 F.2d 139, 144 n. 6 (3d Cir.) (remarking "a group boycott ... is illegal per se under section 1 of the Sherman Act") (citation omitted), *cert. denied,* 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988).

■■■■ PP & L contends that the Court cannot designate the all-electric agreements as *per se* illegal. According to PP & L, the instant case does not provide an example of "horizontal agreements" because PP & L did not contract with gas companies, propane sellers, and fuel dealers. The only agreements at issue, as far as PP & L is concerned, are "vertical agreements" between the sellers and buyers of electricity, and "vertical restraints of trade, which do not present an express or implied agreement to set resale prices, are evaluated under the rule of reason." *Orson,* 79 F.3d at 1368. Plaintiffs characterize both the all-electric agreements and the conversion grants as *per se* illegal, describing them as either tying agreements or group boycotts.

■■■■ The Court concludes that the agreements constituted neither tying arrangements nor group boycotts. "In a tying arrangement, the seller sells one item, known as the tying product, on the condition that the buyer also purchases another item, known as the tied product." *Allen–Myland v. Int'l Business Mach. Corp.,* 33 F.3d 194, 200 (3d Cir.) (citation omitted), *cert. denied,* 513 U.S. 1066, 115 S.Ct. 684, 130 L.Ed.2d 615 (1994). At first blush, the all-electric agreements resemble tying arrangements—PP & L sells one product, electricity, on the condition that the developer purchase another product, the heat pump. Once the heat pump is connected, PP & L enjoys a permanent customer. Before the Court can conclude that a tying arrangement exists, however, it must find that the "tied" product and the "tying" product are two separate products. *See Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 614, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953) (referring to the "common core of the adjudicated unlawful tying arrangements" as "the forced purchase of a second distinct commodity with the desired purchase of a dominant 'tying' product, resulting in economic harm to competition in the 'tied' market"). Examples of tying arrangements involving separate products include a defendant's refusal to lease salt dispensing machines unless the lessee agrees, in addition, to purchase from defendant the salt used therein, *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), and a railroad's insertion, in a lease, of a "preferential routing" clause requiring that the lessees give the railroad preference in transporting goods originating from the leased lands, *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

The agreements are *not* tying arrangements. The underlying product in this antitrust litigation is residential heating. Admittedly, that product has separate components. After adjustments are made to an electric thermostat, the heat pump extracts air from the outside, treats the air, and forces it, through vents, into the living area. This entire process, however, depends exclusively on electricity. The Court therefore finds that PP & L sold only one product through the all-electric agreements and the conversion grants: electricity for residential heating. While it also arranged for the installation of heat pumps, the heat pumps play, at best, an ancillary role, amounting to nothing more than a conduit for electricity that transforms it into a heating source. In the absence of a second product, a tying arrangement cannot exist.

In reaching this conclusion, the Court adopts the rationale employed in *Washington Gas Light Co. v. Virginia Elec. and Power Co.*, 438 F.2d 248 (4th Cir.1971) which rejected a gas utility's allegation that an electric utility's practice of reducing the costs, to a contractor, of installation for an underground residential distribution line, in exchange for a commitment by the contractor to build an all-electric house, constituted a tying arrangement and hence a *per se* violation of § 1 of the Sherman Act. The electric utility also furnished credit, based on anticipated electrical usage, for underground residential distribution installation. The court concluded that the electric utility did not conduct a tying arrangement because it sold only one product, electricity. It characterized the delivery of electricity as "an ancillary and necessary part of the business of producing and selling electrical power. This was simply a new method of delivery.... There was no separate market for the installation of underground wiring.... That there are not dual markets strongly suggests that there are not separate products." *Id.* at 252 (referring to *Times–Picayune*, 345 U.S. at 614, 73 S.Ct. at 883). *See also Grason Elec. Co. v. Sacramento Mun. Util. Dist.*, 571 F.Supp. 1504, 1527 (E.D.Cal.1983) (finding "electrical energy systems" are not "a product distinct from retail electric energy"). While the heat pump lies farther down the chain of distribu-

tion than underground wiring, it does nothing more than transform electric energy into a viable heating source.

■ Similarly, Plaintiffs' allegation of a classic group boycott fails. A group boycott is a concerted effort by a group of competitors "at one level to protect themselves from competition from non-group members who seek to compete at that level. Typically, the boycotting group combines to deprive would be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates." *Larry V. Muko, Inc. v. Southwestern Pennsylvania Bldg. and Constr. Trades Council*, 670 F.2d 421, 429 n. 11 (3d Cir.) (citation omitted), *cert. denied*, 459 U.S. 916, 103 S.Ct. 229, 74 L.Ed.2d 182 (1982). The activity alleged here involves neither a boycott nor a refusal to deal. The only consequence associated with the failure to abide by the terms associated with either the all-electric agreements or the conversion grants was ineligibility for cash incentives, not a concerted refusal to do business.

■ The Court agrees with PP & L's assertion that the agreements constitute vertical restraints of trade and not horizontal restraints of trade. The agreements are "vertical"—between "entities operating at different levels of the market structure, such as manufacturers and distributors"—and *not* "horizontal"—"among competitors at the same level of distribution." *Black's Law Dictionary* 1563, 737 (6th ed.1991). PP & L, a supplier of electricity, entered into an agreement with builders acting at a different level of distribution. "[A] purely vertical arrangement, by which (for example) a supplier or dealer makes an arrangement exclusively to supply or serve a manufacturer, is not a group boycott." *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 594 (1st Cir.1993) (referring to *Klor's, Inc. v. Broadway–Hale Stores*, 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959)).

The Court considers both cases relied on by Plaintiffs distinguishable. *Radiant Burners, Inc. v. Peoples Gas Light and Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961) involved an antitrust suit brought by a

gas burner manufacturer against an association of suppliers of natural gas. Similarly, in *Fashion Originators' Guild of America, Inc. v. Federal Trade Comm'n,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), garment manufacturers and textile manufacturers dealt only with buyers who would not use textiles that had been copied. Both cases dealt with concerted agreements among many, if not all, competing suppliers to refuse to sell their products unless certain conditions were met. The penalties for noncompliance with the underlying agreements were boycotts amounting to outright refusals to deal.

By contrast, the instant lawsuit, brought by suppliers of oil heat against the sole supplier of an alternative source of energy, attacks *inter alia* an agreement between that competitor and the builders who select the form of energy to be placed in new homes. Assuming, for the purposes of this analysis only, that the builders acted as retailers in that they connected PP & L with consumers, the record contains no evidence of a concerted refusal to deal or sell among competing suppliers at the same level of production. The only penalty for noncompliance involved the withholding of a promotional cash incentive. *See* Earl W. Kintner, *Federal Antitrust Law* § 10.29 (remarking "a mere promotional incentive which may tend to persuade economic actors to choose one product or service over another cannot be classified as a group boycott") (referring to *Sulmeyer v. Coca Cola Co.,* 515 F.2d 835, 845 (5th Cir.1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976)).[8]

### 2. The Agreements are Exclusive Dealing Arrangements

While the Court finds great difficulty in pigeonholing the challenged activity into one of the definitions of *per se* illegal activity, the contested agreements easily qualify as "exclusive dealing arrangements."

An exclusive dealing agreement requires "the purchaser not to deal in the goods of a competitor of the seller." *Town Sound,* 959 F.2d at 473 n. 2. Generally, the "seller agrees to sell to a buyer on the condition that the buyer agrees not to deal in competitive products." 2 Von Kalinowski § 6G.01[1]. *See also* Earl W. Kintner, *Federal Antitrust Law* § 10.39 (1980) (stating exclusive dealing arrangements "condition business dealings upon some ancillary or non-ancillary action or inaction on the part of those entering into the arrangement"); Lawrence A. Sullivan, *Antitrust* § 163 (1977) (remarking an "exclusive dealing contract involves a commitment by a buyer to deal only with a particular seller"). In the instant case, the all-electric agreements specifically required a builder to ensure that all homes in the development had electric heating systems that would not be supplemented by an alternative source of energy.

PP & L denies that the all-electric agreements constitute exclusive dealing contracts, suggesting the agreements affected "less than all purchases." *See Barr,* 978 F.2d at 110 n. 24 (noting "[a]n agreement affecting less than all purchases does not amount to true exclusive dealing") (citing *Kellam Energy, Inc. v. Duncan,* 668 F.Supp. 861, 883–84 (D.Del.1987)). In support of this assertion, they point to testimony from various developers averring that in spite of the language of the all-electric agreements, the developers knew they could purchase oil or gas heating systems with no consequence and proceeded, on some occasions, to install alternative residential heating systems in developments subject to the all-electric agreements. PP & L likens the all-electric agreements to nothing more than ordinary volume discount offers. Plaintiffs protest that in spite of PP & L's contention that the developers ignored the restrictive language contained in the all-electric agreements, a PP & L employee testified that he "could not speak" to the question

---

8. Asserting the agreements are inherently suspect restraints, Plaintiffs ask the Court, in the alternative, to apply the abbreviated "quick look" rule of reason analysis. This approach applies "where *per se* condemnation is inappropriate, but a full-blown industry analysis is not required to demonstrate the anticompetitive character of an inherently suspect restraint." *Orson,* 79 F.3d

at n.9 (citation omitted). In the instant case, in order to assess the anticompetitive effects, if any, of PP & L's allegedly violative conduct, the Court must conduct a rather comprehensive examination of the home heating industry in PP & L's service area. Accordingly, the Court does not consider the "quick look" approach applicable.

whether "[a]ll the builders knew [PP & L] would not enforce this agreement" and stated, "[w]hy would we produce an agreement that is designed to market our product and then tell a person.... '[I]t doesn't mean anything.'" (Pl.'s Ex. 8 at 121–22). The Court therefore faces a fact dispute concerning the developers' supposed belief that the language contained in the all-electric agreements was not binding, precluding a finding, at this stage, that the developers dealt freely with other suppliers of residential heating systems. *See Kellam Energy,* 668 F.Supp. at 883 (finding "[n]othing in the requirements contracts between the parties restricts [purchaser] from purchasing gasoline from other suppliers at [purchaser's other outlets]. Each contract applies only to a particular location, and the record reveals that [purchaser] dealt openly with other wholesalers. Five of [purchaser's] locations were not supplied by [supplier]").

Viewing the submissions in the light most favorable to Plaintiffs compels the conclusion that the all-electric agreements implicated both the spirit and the purpose of the exclusive dealing arrangement definition. PP & L required developers not to deal with its competitors and to install electric residential heat. A developer's failure to comply with this condition resulted in a penalty to the builder. Additionally, the clauses forbidding the supplementation of the electric heating systems with fossil fuels and other competing energy sources conditioned future dealings between PP & L and the developers on the developers' refusal to deal with PP & L's competition. *See* 2 Von Kalinowski § 6G.01[1] (stating that an exclusive dealing contract "conditions future dealing on the purchaser's agreement not to deal with the supplier's competitors").

The Court evaluates both exclusive dealing arrangement's and vertical restraints under

the "rule of reason" analysis. *See Jefferson Parish Hosp. Dist. Number 2 v. Hyde,* 466 U.S. 2, 44, 104 S.Ct. 1551, 1575, 80 L.Ed.2d 2 (O'Connor, J. concurring) (remarking "[e]xclusive dealing arrangements are independently subject to scrutiny under § 1 of the Sherman Act, and are also analyzed under the rule of reason") (citing *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 333–35, 81 S.Ct. 623, 631–32, 5 L.Ed.2d 580 (1961)); *Orson,* 79 F.3d at 1368 (remarking "[t]he Supreme Court has instructed that vertical restraints of trade, which do not present an express or implied agreement to set resale prices, are evaluated under the rule of reason"); *U.S. Healthcare,* 986 F.2d at 595 (suggesting that to condemn exclusive dealing arrangements requires "the normal treatment afforded by the rule of reason"); *Williams v. Indep. News Co., Inc.,* 485 F.2d 1099, 1104 (3d Cir.1973) (stating "[b]y definition an exclusive dealing contract excludes potential customers from competition with the exclusive dealer[,][s]uch a restraint is not per se unreasonable").

"[T]he inquiry mandated by the rule of reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." *National Society of Professional Engineers v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). The rule of reason analysis requires the Court to consider "all relevant factors in examining a defendant's purpose in implementing a restraint and the restraint's effect on competition." *Orson,* 79 F.3d at 1367 (citation omitted).[9] Plaintiffs "bear the initial burden of showing that the alleged combination or agreement produced adverse, anticompetitive effects within the relevant product and geographic markets." *Id.* at 1368 (citation omitted). "[T]he adverse impact must be on

---

9. Under the traditional rule of reason:

> The true test of illegality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of

the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be obtained, and all relevant facts.

*United States v. Brown Univ. in Providence in the State of Rhode Island,* 5 F.3d 658, 668 n. 8 (3d Cir.1993) (citing *Board of Trade of Chicago v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243–44, 62 L.Ed. 683 (1918)).

*competition,* not on any individual competitor or plaintiff's business." *Reazin v. Blue Cross and Blue Shield of Kansas, Inc.,* 899 F.2d 951, 960 (10th Cir.), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990). Plaintiffs satisfy this burden by "proving the existence of actual anticompetitive effects, such as reduction of output, increase in price, or deterioration in quality of goods and services." *Orson,* 79 F.3d at 1367 (citation omitted).

> Due to the difficulty of isolating the market effects of the challenged conduct, however, such proof is often impossible to make. Accordingly, the courts allow proof of the defendant's 'market power' instead. Market power—the ability to raise prices above those that would prevail in a competitive market—is essentially a surrogate for detrimental effects.

*Id.* (citations omitted).

Once plaintiff meets this initial burden of "adducing adequate evidence of market power or actual anticompetitive effects, the burden shifts to defendant to show that the challenged conduct promotes a sufficiently pro-competitive objective. To rebut, the plaintiff must demonstrate that the restraint is not reasonably necessary to achieve the stated objective." *Id.* at 1367–68 (citations omitted).

### 3. Application of the Rule of Reason

Plaintiffs contend that both the all-electric agreements and the conversion grants violate § 1 of the Sherman Act, relying heavily on *Advanced Health–Care Servs., Inc. v. Radford Community Hosp.,* 910 F.2d 139 (4th Cir.1990) (finding for purposes of a 12(b)(6) motion to dismiss, a durable medical equipment supplier stated a § 1 claim against its competitor and several hospitals by alleging that they conspired to exclude all competition in the durable medical equipment markets and that this exclusion was not the result of business acumen, but of anticompetitive monopolistic intentions executed through marketing strategies and kickback schemes; the hospitals received 65% of all revenues generated by rentals of competitors' products to discharged patients). According to Plaintiffs, PP & L foreclosed the

homeowner's ability to select the most economical and desirable heating system. Finally, Plaintiffs suggest that at the very least, whether PP & L possesses "market power" presents a question of fact for jury resolution.

PP & L claims that the record contains insufficient evidence of market power because the oil dealers hold a greater share of the relevant market than PP & L. According to PP & L, the 29,512 grants affected no more than 3% of the total 1,074,015 homes in the relevant market, 97% of the homes in the relevant market were unaffected by the alleged anticompetitive activity, only 120 out of 1,500 developments operated under the all-electric agreements, and approximately 90% of the residential developments constructed were unaffected by the all-electric agreements. (Def.'s Ex. 14; Pl.'s Ex. 46).

While not controlling, an examination of PP & L's market power provides a starting point for the Court's evaluation of the challenged restraint's impact on competition. *Compare Brader v. Allegheny Gen. Hosp.,* 64 F.3d 869, 878 (3d Cir.1995) (remarking " 'market power' is relevant only to the extent that it is a factor in the determination of the reasonableness of the restraint") *with Reazin,* 899 F.2d at 967–68 & n. 24 (highlighting the disagreement among courts over whether "a particular market share should be given conclusive or merely presumptive effect ... or whether market share is only a starting point in the inquiry") (citing cases) *and Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 666 (7th Cir. 1987) (describing defendant's possession of market power as a "threshold inquiry" and remarking "[o]nly if [plaintiff] can allege facts that give rise to an inference that [defendant] had sufficient market power to control liquor prices must we proceed to the first step in the Rule of Reason analysis"), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987).

Had the Court concluded that PP & L possessed sufficient monopoly power as a matter of law to establish a claim of actual monopolization under the § 2 of the Sherman Act, it could easily find market power under

§ 1. *See Eastman*, 504 U.S. at 481, 112 S.Ct. at 2090 (finding "[m]onopoly power under § 2 [actual monopolization claim] requires, of course, something greater than market power under § 1" and describing § 2 as the "more stringent monopoly standard"); *Reazin*, 899 F.2d at 967 (remarking that market and monopoly power "differ only in degree— monopoly power is commonly thought of as 'substantial' market power"); 3 Von Kalinowski § 17.01[2] (finding that "since the existence of actual or near monopoly power is a requisite element of actual ... monopolization under section 2, commentators sometimes have said that the quantum of proof required under that section exceeds that required by section 1"). In the absence of such a finding, the Court conducts a comprehensive evaluation of PP & L's market power.

▇▇▇▇ PP & L's market shares of 31% of the relevant market and 53% of the new construction submarket neither constitute *prima facie* evidence of market power nor preclude a finding of market power. *See Valley*, 822 F.2d at 666 (finding "70%–75% of market share constitutes market power ... and that a 20%–25% market share or less does not constitute market power").[10] When considered in conjunction with other factors like barriers to entry, control over a superior resource, relative size, strength of the competition, and other market specific characteristics, market share may indicate market power. *See Reazin*, 899 F.2d at 967 & n. 23 (remarking "[m]arket share is relevant to the determination of the existence of market or monopoly power, but 'market share alone is insufficient to establish market power' " and listing relevant factors as *inter alia* "power of price and power of competition ... the existence and intensity of entry barriers, elasticity of supply and demand, the number of firms in the market, and market trends")

(citation omitted); *Valley*, 822 F.2d at 666 (finding "[m]arket power is normally inferred from the possession of a substantial percentage of the sales in a market carefully defined in terms of both product and geography") (citation omitted).

In the instant case, assessing PP & L's market share in light of other factors, the Court cannot conclude as a matter of law, that PP & L does not possess market power as understood and defined under § 1 of the Sherman Act. The Court has already found evidence of high barriers to entry. Viewing the facts in a light most favorable to Plaintiffs reveals that they compete in a market populated by at least one monopolist, PP & L, a large gas company enjoying a significant share of the gas heating market, and a panoply of oil dealers, none of whom controls a significant portion of the market. PP & L's relative size and status as the sole provider of electricity provide it with considerable advantages over the Plaintiffs, all of whom compete in the highly fragmented oil segment. PP & L enjoys exclusive control over this resource and therefore possesses *durable* market power. PP & L's market share in the relevant market has increased consistently (despite its supracompetitive prices), and its declining market share in the new construction submarket, from 84% in 1986, does not foreclose a finding of market power. *See Reazin*, 899 F.2d at 970 (stating "[a] declining market share may reflect an absence of market power, but it does not foreclose a finding of such power") (citation omitted).

The Court now looks to PP & L to demonstrate that the all-electric agreements promote a sufficiently procompetitive objective. PP & L proffers that the all-electric agreements produced inherent advantages in price, convenience, and service. According

10. In assessing PP & L's market share, the Court defines the relevant market as residential home heating in PP & L's service area and the submarket as new residential construction in PP & L's service area. While this definition mirrors that employed in disposing of the Sherman Act § 2 claim, the Court cannot fashion, and the parties have not put forth, a more germane definition designed specifically for the Sherman Act § 1 claim. *Compare* 2 Von Kalinowski § 6.02[2] (stating that while "market power under § 1 is

not necessarily the same as monopoly power under § 2 of the Sherman Act, defining markets under § 1 involves the same analysis as under § 2 of the Sherman Act") *with Kellam*, 668 F.Supp. at 889 n. 41 ("defining the relevant market for purposes of an attempted monopolization claim is different than defining the market for an exclusive dealing claim. In an exclusive dealing context, the law is only concerned with the market in the product under contract").

to PP & L, builders obtained the benefit of predictability through the provision of a continuous stream of cash grants, increased good will and marketing success, full discretion in their dealings, and limited penalties for noncompliance. (Def.'s Ex. 5 at 96, 102; Ex. 31 ¶ 4(f); 32 ¶ 4(b); Ex. 35 ¶ 5; Ex. 40 ¶ 6; Ex. 41 ¶ 6; Ex. 42 ¶ 7(c)). Plaintiffs, argue PP & L, made no efforts to either develop and procure builder business or effectively market to the builders.

In the presence of a procompetitive justification for the all-electric agreements, the Court examines their anticompetitive effects. *See Brown*, 5 F.3d at 669 (stating once "defendant offers sound pro-competitive justifications, however, the court must proceed to weigh the overall reasonableness of the restraint using a full-scale rule of reason analysis"). Given the anticompetitive nature of the all-electric agreements, the Court cannot conclude, as a matter of law, that these agreements did not constitute unreasonable restraints of trade. Furnishing cash grants and other financial incentives—which PP & L was able to do because of its size relative to the competition and its monopoly on electricity—allowed PP & L to close the market off to alternate heating sources. PP & L leveraged advantages it enjoyed as the sole provider of electricity into the new residential submarket, taking advantage of advance notice of new construction, using its customer service department to increase sales, and marketing through billing inserts. PP & L targeted builders in order to control, from the inception, what type of heating system would be installed in a new home. With respect to the all-electric agreements, it should be noted that "all-electric" means "all-PP & L." Once PP & L negotiated an all-electric agreement, it was guaranteed a future supply of customers that could turn only to PP & L. The oil dealers do not enjoy the same benefits. An "all-oil" agreement would not assure any dealer business; they would still compete among themselves for the customer.

The nature of the agreements reveals their deleterious effects. In exchange for an agreement to exclude competitive fossil fuels and prevent supplementation with non-elec-

tric sources, builders received cash grants, often times in advance, tightening PP & L's grip on the development. The agreements clearly suppressed, rather than promoted, competition and effectively diminished Plaintiffs' presence in the new residential heating submarket. They were certainly effective; 95% of the homes constructed under all-electric agreements received electric heat while only 49.6% of those homes constructed in developments that were not controlled by all-electric agreements received electric heat. (Pl.'s Ex. 62). Prior to the agreements, Plaintiffs faced a more level playing field in this submarket. Once signed, the all-electric agreements block gas and oil from the development and forbid the homeowner to purchase a supplementary system from non-electric sources. Having found sufficient evidence of PP & L's specific intent to monopolize to survive summary judgment, the Court, drawing inferences in Plaintiffs' favor, reasons that PP & L devised these all-electric agreements in an attempt to dominate the new construction submarket.

The Court must also "take into account whether the competition eliminated by the clause is significant within the context of the total competition extant in the industry ... [and attempt] to measure the effect of the challenged restriction on the market structure." *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1247 (3d Cir.1975). Between 1981 and 1995, PP & L awarded 29,512 grants while 208,681 new residential connections were established during that period, and between 1987 and 1995, PP & L awarded 27,925 grants while 133,756 new connections were established. (Pl.'s Ex. 46). Admittedly, the 29,512 grants constitute only 2.7% of the 1,074,015 homes in the relevant market. The Court considers that statistic misleading, however, because of the peculiar nature of the market at issue. Converting a heating system entails substantial costs. Often, significant hardware must be removed, such as a chimney, furnace, or heat pump, and corresponding changes in the method of distributing the heat must be made, requiring alterations to vents, radiators, baseboards, etc. Such expenses diminish the willingness of homeowners to convert

an existing heating system. This suggests that once a heating system is installed, that house is no longer part of the relevant market. High conversion costs mean that while PP & L has over 1,000,000 homes in its service area, those homes with existing heating systems are extremely difficult to reach, and only a small fraction—those with the financial resources and desire to convert their system—are susceptible to marketing.

█ The high costs of conversion, and the veritable removal from the market of those homes with existing systems, suggest that the new home submarket is crucial to the economic sustenance of residential heating suppliers. The Court therefore considers the 29,512 grants in light of the 208,681 new residential connections made between 1981 and 1995 and the 133,756 new connections made between 1987 and 1995. These significantly higher percentages for the new construction submarket provide a more accurate reflection of the all-electric agreements' anticompetitive effects.

The record also contains evidence of antitrust injury. *See Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 641 (3d Cir.1996) (requiring a court to "analyze the antitrust injury from the viewpoint of the consumer. An antitrust plaintiff must prove the challenged conduct affected the prices, quantity or quality of goods or services, not just his own welfare") (citations omitted). The agreements lessened choices for new homeowners and made builders and developers resistant to the installation of alternative heating sources. They required new home purchasers to incur the increased costs associated with an electric heating system and forego a less expensive and more efficient oil or gas system. By inducing builders to install electric heating systems with grants, PP & L effectively strapped new homeowners with an electric heating system that required them to pay supracompetitive prices for a less desirable system that they did not specifically choose. In a purely competitive market, the new home purchaser could freely choose among gas, oil, or electric based on the advantages and disadvantages presented by each system. Finally, Plaintiffs presented an extensive expert report outlining the inju-

ry they suffered as competitors. (Pl.'s Ex. 96). PP & L's expert's report, however, which urges that Plaintiffs can point to no evidence of antitrust injury, creates a genuine issue of material fact for jury resolution. (Def.'s Ex. 24 ¶¶ 124–32). Accordingly, the Court cannot conclude as a matter of law that the all-electric agreements did not constitute an unreasonable restraint of trade.

### 4. Conversion Grants

█ An examination of the conversion grants, however, compels a different result. The unique factors implicated by the all-electric agreements, which dealt largely with *new* home construction, have no applicability to conversion grants which were awarded to *existing* homeowners. The submissions relied on by Plaintiffs fail to establish that such conversion grants had any significant impact on the relevant market.

PP & L initiated the conversion grant program in 1983, and conversion grants enabled PP & L to lessen the financial drawbacks associated with converting a heating system. (Pl.'s Ex. 60). While the record does not reveal the exact number of conversion grants PP & L paid to existing homeowners, it states that PP & L converted 218 homes in 1987, 346 homes between 1988 and 1990, and 72 homes between 1990 and 1994. In its "Annual Conservation and Load Management Report for 1987," PP & L stated "[t]he projection for 1988 is to have 400 storage space and water heating systems installed as replacements to present fossil-fueled space heating and water heating systems." PP & L set the same number at 250 in its 1988 Report. (Pl.'s Ex. 60 at 510, 527; Def.'s Ex. 15).

These numbers can only be considered in the context of the *existing* homes in the relevant market. Between 1983 and 1995, there were 192,519 homes constructed in a relevant market of 1,074,015 homes, leaving 881,496 existing homes during this period for conversions. Assuming PP & L converted its targeted 400 homes per year between 1983 and 1995 (a total of 4,800 homes), these conversion grants affected only 0.5% of 881,-496 existing homes in the relevant market. Plaintiffs have failed to establish that the

conversion grants eliminated a significant amount of competition to raise a genuine issue of material fact with regard to whether the conversion grants constitute an unreasonable restraint of trade. *See* 2 Von Kalinowski § 6G.03[2] (establishing numerical guidelines for § 1 violations and finding "under the rule of reason, an exclusive dealing or requirements contract probably would not violate Section 1 of the Sherman Act unless it affected over 50% of the relevant market").

### 5. Conclusion—Sherman Act § 1

Accordingly, Plaintiffs' claims under § 1 of the Sherman Act only survive with respect to the all-electric agreements insofar as those agreements affect *new* homes. To the extent that Plaintiffs allege that PP & L unreasonably restrained trade by (1) offering cash incentives and financial aid to convert existing homeowners to electric heat and (2) offering builders cash incentives through the all-electric agreements to convert existing homes, the Court grants summary judgment to PP & L.

### C. CLAYTON ACT § 3

██ Plaintiffs assert that the all-electric agreements violate § 3 of the Clayton Act. At a minimum, argue Plaintiffs, a triable fact issue exists as to whether the agreements substantially foreclosed competition in the relevant market. Considering that the all-electric agreements foreclosed 14% of the new home submarket (setting the damage period between 1981 and 1995 and 21% for the period between 1987 and 1995), Plaintiffs suggest that a jury could find substantial foreclosure. These percentages, urge Plaintiffs, when considered in conjunction with PP & L's size, its achievement of an 84% share of the submarket in 1986, its achievement of more than 70% saturation in the new home submarket between 1987 and 1995, and the fact that homeowners must pay substantially higher prices for electric heat, support a finding of substantial foreclosure offensive to § 3. (Pl.'s Ex. 37; Ex. 46; Ex. 67; Ex. 69; Def.'s Ex. 66 at 4–5). According to Plaintiffs, the substantial market effect is seen in the consumers paying higher prices for electric energy than they would if oil was widely used. Furthermore, argue Plaintiffs, PP & L nearly doubled its saturation with the agreements: 95% of homes in developments controlled by all-electric agreements contain electric heat compared to 49.6% of new homes in developments not governed by the all-electric agreements.

PP & L argues that Plaintiffs cannot demonstrate substantial foreclosure when only (1) 8% of new developments, 120 out of 1,500, were governed by the all-electric agreements, (2) 3% of the relevant market (29,512 out of 1,074,015 homes) has been affected, and (3) 14% of the submarket (29,512 out of 208,681 new homes constructed) has been affected. This left open 85% of all new homes constructed and 97% of all homes in the relevant market, percentages Plaintiffs admitted indicate strong business possibilities. According to PP & L, the Clayton Act applies only to the sale of goods, wares, merchandise, machinery, supplies, or other commodities and *not* electricity; PP & L relies on *Groton v. Connecticut Light & Power Co.*, 497 F.Supp. 1040, 1052 n. 14 (D.Conn.) (finding, for purposes of § 2(a) of the Clayton Act (15 U.S.C.A. § 13(a)) that "electricity is not a commodity") (citing *City of Newark v. Delmarva Power & Light*, 467 F.Supp. 763, 773–74 (D.Del.1979) (remarking "the wording of the statute, its legislative history, and the regulation of the electric utility industry which existed at the time [of] the adoption of the Robinson–Patman Act, all suggest that 'commodity' was not intended to encompass electric power")), *aff'd in part and remanded*, 662 F.2d 921 (2d Cir.1981).

### 1. Distinguished From Sherman Act § 1

██ Section 3 of the Clayton Act provides:

**Sale, etc., on agreement not to use goods of competitor**

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States ... or fix a price charged therefor,

or discount from, or rebate upon, such price on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C.A. § 14 (West 1973). "Section 3 applies to a narrower range of transactions than does Section 1 [including goods or commodities but not including real property, advertising, or services. Furthermore, a] lesser degree of anticompetitive injury need be demonstrated under Section 3 than under Section 1." 2 Von Kalinowski § 6G.03.

■■■ While § 1 applies to actual restraints of trade, § 3 "condemn[s] sales or agreements where the effect of such sale or contract would, under the circumstances disclosed, probably lessen competition or create an actual tendency to monopoly." *Tampa*, 365 U.S. at 326, 81 S.Ct. at 627 (citation omitted). "The legality of an exclusive dealing arrangement under the Clayton Act depends on whether the competition foreclosed constitutes a substantial share of the relevant market." *Barr*, 978 F.2d at 110 (citation omitted). The two leading § 3 cases are *Tampa* (1961) and *Standard Oil Co. of California and Standard Stations, Inc. v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

**2. Quantitative Substantiality Test**

■■ In *Standard*, the Supreme Court found that agreements requiring contracting retailers to purchase all their gasoline from the Standard Oil substantially lessened competition. Accounting for 23% of sales, Standard Oil was the largest gasoline retailer in the area. These exclusive supply contracts covered 6.7% of the area's sales and foreclosed competing refiners from marketing their product through 16% of the independent retail gasoline outlets in the region. *Standard*, 337 U.S. at 295, 69 S.Ct. at 1053. The Supreme Court adopted a "quantitative substantiality" test whereby a § 3 case would be made out "upon a showing that the exclusive dealing arrangement involved a significant share of the relevant market, or possibly even upon a showing that the arrangement involved a substantial volume of commerce." *American*, 521 F.2d at 1251 n. 75 (citing *Standard*, 337 U.S. at 299, 310–14, 69 S.Ct. at 1055, 1060–62). Applying *Standard*, "the only relevant economic indicator is the percentage of the market the contracts foreclose." *Barr*, 978 F.2d at 110 (citation omitted). Despite the Supreme Court's later interpretation of § 3 in *Tampa*, *Standard* remains viable authority. *See American*, 521 F.2d at 1251 n. 75 (stating "[a]lthough the Supreme Court has modified the rigid rule articulated in *Standard Oil*, it has not indicated that the result in *Standard Oil* would differ from *Tampa Electric* ").

■■ Taking the *Standard* approach, the all-electric agreements do not violate § 3 because Plaintiffs have failed to produce proof "that competition has been foreclosed in a substantial share of the line of commerce affected." *Standard*, 337 U.S. at 314, 69 S.Ct. at 1062. The Court relies on the same definitions of relevant market and submarket crafted in dealing with the Sherman Act claims. *See* 2 Von Kalinowski § 13.03[3] (stating "[t]he manner in which the relevant market is identified [under § 3 of the Clayton Act] is the same under the Sherman Act"). The all-electric agreements affected only 3% of the relevant market. *Compare Barr*, 978 F.2d at 111 (finding 15% preemption, in the presence of other factors, insufficient to make out a § 3 claim) *and American*, 521 F.2d at 1252 (finding foreclosure of 14% "may well offend limitations which the Clayton Act places on exclusive contracts") *with Tampa*, 365 U.S. at 333, 81 S.Ct. at 631 (finding .77% insubstantial). *See also* 2 Von Kalinowski § 6G.04[2] n.39 (stating "[t]he lowest percentage of sales volume in the relevant market to be termed substantial was .... about 5%") (citing *Lessig v. Tidewater Oil Co.*, 327 F.2d 459 (9th Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964)). While the all-electric agreements affected 21% of the new construction submarket, the Court reserves discussion of the

unique implications associated with that statistic for its "qualitative" analysis.

### 3. Qualitative Substantiality Test

■■■■ Evaluating a requirements contract providing a utility company with an assured supply of coal for its generating plants that foreclosed only .77% of the relevant market, *Tampa* spawned the "qualitative substantiality test." *Tampa* considered the requirements contract lawful in light of the small percentage of the market foreclosed, the non-dominant position of the seller, and the failure of the exclusive dealing arrangements to hamper competition in the coal industry. The qualitative substantiality test examines three factors:

> It is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

*Tampa*, 365 U.S. at 329, 81 S.Ct. at 629. Under this test, "the degree of market foreclosure is only one of the factors involved in determining the legality of an exclusive dealing arrangement." *Barr*, 978 F.2d at 111 (citation omitted). The Third Circuit applies the qualitative substantiality test. *See id.* (applying *Tampa*); *American*, 521 F.2d at 1251 n. 75 (remarking that the qualitative test "introduced greater flexibility").

Application of the qualitative substantiality test compels a different conclusion from that reached under the quantitative substantiality test. The nature of the agreements, and PP & L's status as a monopoly, assure that the developments will be "all-PP & L" to the exclusion of oil and gas. The all-electric agreements foreclosed 21% of the submarket. As discussed *supra*, the new construction submarket plays a crucial role in the economic viability of these competitors, and the importance of that market cannot be underestimated. The high costs of conversion lessen the significance of the relevant market, and

the "permanence" of an existing system makes the new construction submarket crucial to the sustenance of these competitors. The inability to access this submarket has deleterious effects on Plaintiffs' competitiveness in the relevant market, and blocking expansion into 21% of the new home submarket results in a substantial foreclosure of the relevant market. *See American*, 521 F.2d at 1252 (finding foreclosure of 14% "may well offend limitations which the Clayton Act places on exclusive contracts"); *Dictograph Prods., Inc. v. Federal Trade Comm'n*, 217 F.2d 821, 828 (2d Cir.1954) (considering control of 20% retail outlets through exclusive dealing contracts by a large industry leader substantial foreclosure), *cert. denied*, 349 U.S. 940, 75 S.Ct. 784, 99 L.Ed. 1268 (1955).

The Court does not reach the same result with respect to the conversion grants. The qualitative analysis applicable to the all-electric agreements—which dealt mostly with *new* home construction—is not germane to the conversion grants—which PP & L awarded to *existing* homeowners. The submissions relied on by Plaintiffs reveal that the conversion grants affected only 0.5% of 881,496 existing homes in the relevant market, an insufficient figure to demonstrate that they either had significant impact on competition in the relevant market or involved a substantial portion of commerce in the relevant market. The record in the instant case therefore fails to raise a genuine issue of material fact with regard to whether PP & L's use of the conversion grants violates § 3 of the Clayton Act. *See Tampa*, 365 U.S. at 331, 81 S.Ct. at 630 (considering foreclosure of less than 1% inadequate).

■■■ The Court rejects PP & L's contention that electricity is not a commodity for purposes of either the Clayton Act or the Robinson–Patman Act. Admittedly, *City of Newark* refused to include electricity within the definition of commodity. The Court notes, however, that *City of Newark* assessed § 2(a) of the Robinson–Patman Act, and this Court limits its holding to that section. *See City of Newark*, 467 F.Supp. at 773 n. 12 (remarking "[n]one of the cases cited by plaintiffs decide the issue of whether the

terms commodity in *Section 2(a)* includes electric power") (emphasis supplied). Furthermore, a considerable number of cases have found that electricity is a commodity for purposes of the Clayton and Robinson–Patman Acts. *See Seaboard Supply Co. v. Congoleum Corp.,* 770 F.2d 367, 371 n. 3 (3d Cir.1985) (remarking "the Supreme Court held that section 2(c) was independent of 2(a)") (citation omitted); *Kirkwood v. Union Elec. Co.,* 671 F.2d 1173, 1181–82 (8th Cir. 1982) (finding electricity is a commodity for Robinson–Patman purposes; "[e]lectric power can be felt, if not touched. It is produced, sold, stored in small quantities, transmitted, and distributed in discrete quantities"), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983); *Rankin County Cablevision v. Pearl River Valley Water Supply Dist.,* 692 F.Supp. 691, 693 (S.D.Miss.1988) (remarking "[m]ost of the courts which have considered the issue have concluded that electricity is a commodity subject to the [Robinson–Patman] Act"); *Concord v. Boston Edison, Co.,* 676 F.Supp. 396 (D.Mass. 1988) (same); *Ellwood City v. Pennsylvania Power Co.,* 570 F.Supp. 553, 561 (W.D.Pa. 1983) (same); *Gainesville v. Florida Power & Light Co.,* 488 F.Supp. 1258, 1282 (S.D.Fla. 1980) (considering electricity a commodity under both Clayton and Robinson–Patman Acts; finding *City of Newark* decision an "unnecessarily narrow view of Congressional intent in using the word commodity"). Considering that PP & L generates and sells electricity, and the instant case involves the sale of electricity as a manufactured product that PP & L distributes in the form of residential heat, the Court adopts the rationale expressed in the aforementioned cases.

### 4. Conclusion—Clayton Act § 3

Accordingly, Plaintiffs' claims under § 3 of the Clayton Act only survive with respect to the all-electric agreements insofar as those agreements affect *new* homes. To the extent that Plaintiffs allege that PP & L violated § 3 of the Clayton Act by (1) offering cash incentives and financial aid to convert existing homeowners to electric heat and (2) offering builders cash incentives through the all-electric agreements to convert existing homes, the Court grants summary judgment to PP & L.

### D. ROBINSON–PATMAN ACT § 2(c)

The Robinson–Patman Act, argue Plaintiffs, prohibits PP & L from providing payments to builders (purchasers of the heat pump) in order to exert influence over the builders' selection of electric heat. Plaintiffs allege that PP & L furnished grants to builders and developers that were not provided in exchange for services rendered by the builders and developers. According to Plaintiffs, a cause of action under § 2(c) does not require proof of predatory pricing. Plaintiffs suggest that § 2(c) requires only that a payment be made in connection with the purchase or sale of goods; it does not specifically require that the *seller* make the payment. Finally, Plaintiffs attack PP & L's assertion that the transactions in question do not affect interstate commerce, claiming that the heat pumps, as well as the components from which they are manufactured, are produced outside the Commonwealth by Carrier Corporation in Syracuse, New York.

PP & L argues that *Yeagers II* immunizes these cash incentives. According to PP & L, Plaintiffs have failed to produce evidence of either predatory pricing or sales that crossed state lines, two requirements under § 2(c); PP & L relies on *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974) (stating "the distinct 'in commerce' language of the Clayton and Robinson–Patman Act provisions ... appears to denote only persons or activities within the flow of interstate commerce"). PP & L contends that the record contains no evidence that it is either a seller or a buyer in the heat pump transactions, and therefore the grants do not pass the "seller-buyer" line. Finally, PP & L protests that Plaintiffs have not shown a fiduciary relationship between the builders and potential homeowners, pointing to *Yeagers I,* 804 F.Supp. at 715 (finding, that for purposes of a RICO claim, Plaintiffs' Amended Complaint failed to aver "that the developers and/or builders and/or contractors are employees, agents or fiduciaries of anyone from whom they were

required to obtain consent before accepting the payments").

■ Section 2(c) of the Robinson–Patman Act addresses price discrimination and provides, in part:

**Discrimination in price, services, or facilities—Price; selection of customers**

\* \* \* \*

**Payment or acceptance of commission, brokerage or other compensation**

(c) It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or on behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C.A. § 13(c). This provision "was designed to eliminate the competitive advantage large buyers and sellers attained over their smaller competitors by virtue of their economic clout and bargaining power." *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 991 n. 5 (4th Cir.1990). Section 2(c) forbids payment of unearned monies "to the other party to a transaction or to an agent who is subject to the control of a person other than the one making the payment.... Although the purpose of that section was to eliminate unfair price discrimination, existence of that factor is not a prerequisite to liability." *Seaboard*, 770 F.2d at 370–71 & n. 3 (including commercial bribery within the ambit of § 2(c)).

■ Section 2(c) "encompasses cases of commercial bribery tending to undermine the fiduciary relationship between a buyer and its agent, representative, or other intermediary in a transaction involving the sale or purchase of goods." *Harris v. Duty Free*

*Shoppers Ltd. Partnership*, 940 F.2d 1272, 1274 (9th Cir.1991) (citation omitted). For a finding of commercial bribery, plaintiff "must show that the illegal payments in question crossed the line from buyer to seller or vice-versa." *Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1066 (3d Cir.1988), *aff'd*, 493 U.S. 400, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990). *See Ellwood City*, 570 F.Supp. at 562 (noting "intrastate sales are subject to the Robinson–Patman Act as long as the sales remain in the flow of interstate commerce").

■ Application of the aforementioned legal precepts to the facts presented in the instant case requires extreme innovation. The case law suggests that Congress enacted the Robinson–Patman Act in an effort to curtail the exertion of improper influence by large, financially resourceful players over sale transactions. Similarly, "commercial bribery" presents a prototype of the classic arrangement that § 2(c) aimed to eliminate— a situation where the fiduciary of one party is influenced by another party to the transaction by the payment of brokerage when no services are performed. The transaction in the instant case fails to present the type of arrangement that Congress intended § 2(c) to prevent. The submissions indicate that PP & L furnished money to builders and developers in an effort to exert influence over the builders' decisions to install heat pumps. Plaintiffs obfuscate the issue, however, by focusing on the wrong transaction. The underlying transaction at issue in this case is the sale of electricity by PP & L (seller) to new homeowners (buyers) to operate residential heating systems. The Court considers the sale and installation of heat pumps, and grants paid to builders to induce those sales and installations, ancillary to the sale of electricity by PP & L to new homeowners.

The case *sub judice* would implicate § 2(c) if PP & L paid special consideration to the buyer, an agent of the buyer, or an intermediary subject to the buyer's control. The builders, however, constitute neither (1) agents for the buyer, (2) agents for the seller, nor (3) intermediaries acting on behalf of either the buyer or the seller. The builders

are completely unrelated to, and uninvolved in, PP & L's selling electricity to a new homeowner, even though they may tangentially facilitate that transaction.

Plaintiffs' § 2(c) claim therefore fails because the record does not demonstrate that the protested cash payments crossed the line from buyer to seller. To sustain a § 2(c) claim, Plaintiffs need to illustrate that PP & L's cash payments traveled (1) from PP & L to either the new homeowners or a broker, agent, or intermediary acting on behalf of the new homeowners; or (2) from a broker, agent, or intermediary acting on behalf of PP & L to the new homeowners. *See Seaboard,* 770 F.2d at 372 (finding seller-buyer line was not crossed where a sales agent of the seller bribed the seller's employee and examining a case where "directed verdict for defendant manufacturer" was appropriate because "persons receiving unearned commissions from the manufacturer were not under the control of purchasers or acting on their behalf") (citation omitted); *Environmental,* 847 F.2d at 1066 (finding a complaint that alleged the illegal payment of monies through controlled corporations to government officials designed to influence the awarding of contracts stated a § 2(c) claim); *Ideal Plumbing Co. v. Benco, Inc.,* 529 F.2d 972, 977 n. 4 (8th Cir.1976) (remarking that § 2(c) seeks to prevent "the practice of certain large buyers to demand the allowance of brokerage directly to them upon their purchases, or its payment to an employee, agent, or corporate subsidiary whom they set up in the guise of a broker, and through whom they demand that sales to them be made") (citation omitted).

The absence of any evidence that the monies paid crossed the line from buyer to seller, or vice-versa, precludes a finding that the payments from PP & L to the builders constituted commercial bribery and eliminates Plaintiffs' standing to bring a § 2(c) claim. *See Environmental,* 847 F.2d at 1066–67 (stating "a plaintiff must … meet the standing requirements to proceed [under § 2(c)].... [A] direct competitor of a company that obtains a contract through commercial bribery has standing to press a § 2(c) claim against the briber") (citations omitted). Although Plaintiffs acknowledge

that the transaction does not present a classic § 2(c) violation, they apply an aggressive analysis of the facts presented to depict a § 2(c) violation that enjoys no support in the Third Circuit and constitutes an unnecessary extension and application of the rationale articulated in cases from other circuits. The Court instead elects to reach its own determination of this issue, concluding that PP & L's payments to the builders, which may violate other antitrust laws, do not fall within the explicit language of § 2(c). *See Seaboard,* 770 F.2d at 372 (remarking that "[c]onduct not within the scope of the Act is not made into an antitrust violation by accompanying conduct which is reprehensible under some moral or ethical standard or even illegal under some other law"). Accordingly, the Court grants PP & L's Motion for Summary Judgment on Plaintiffs' § 2(c) claim.

### E. STATE–LAW CLAIMS

Plaintiffs originally asserted state-law causes of action for civil conspiracy and unfair competition. *See Yeagers II,* 22 F.3d at 1263. In July, 1994, Plaintiffs moved to amend their Complaint by (1) alleging a claim of tortious interference with contractual relations with respect to the conversion grants and (2) amplifying the unfair competition claim to specify a cause of action for common-law restraint of trade. (*See* Pl.'s Ex. 93 at ¶¶ 5–8; Doc. Nos. 141, 166). The Court permitted the addition of the tortious interference claim but only insofar as it related to the conversion grants. The Court also allowed Plaintiffs to add a claim for common-law restraint of trade. In their initial Complaint, Plaintiffs pled a generic cause of action for unfair competition, and the Court believed that the addition of the restraint of trade claim would amplify Plaintiffs' general pleading.

#### 1. Tortious Interference with Contractual Relations

The Restatement defines a cause of action for tortious interference with contractual relations as follows:

One who intentionally and improperly interferes with the performance of a con-

tract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766 (1979). The accompanying commentary to that section envisions a balancing test:

[t]he plaintiff's interest in his contractual rights and expectancies must be weighed, however, against the defendant's interest in freedom of action. If the defendant's conduct is predatory, the scale on his side may weigh very lightly, but if his conduct is not predatory, it may weigh heavily. The issue is whether in the given circumstances his interest and the social interest in allowing the freedom claimed by him are sufficient to outweigh the harm that his conduct is designed to produce. In deciding the issue, the nature of his conduct is an important factor.

*Id.* at § 766 cmt. c. Section 767 articulates factors to consider in determining the impropriety of an actor's conduct:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference, and

(g) the relations between the parties.

*Id.* at § 767. The Supreme Court of Pennsylvania has adopted both §§ 766 and 767 of the Restatement (Second) of Torts. *See Small v. Juniata College,* 452 Pa.Super. 410, 682 A.2d 350, 354 & n. 1 (1996) (citing Restatement (Second) of Torts § 767); *Daniel Adams Assoc., Inc. v. Rimbach Publ'g, Inc.,* 360 Pa.Super. 72, 519 A.2d 997, 1000 (remarking that the Pennsylvania Supreme Court has adopted Restatement (Second) of Torts § 766), *appeal denied,* 517 Pa. 597, 535 A.2d 1056 (1987).

▮ The significance of the conversion grants varies depending on the legal context in which the Court examines them. Under § 2 of the Sherman Act, the Court determined that the parties' submissions raise genuine fact issues regarding the possible predatory nature of such grants. The Court nonetheless found that the conversion grants fail under both § 1 of the Sherman Act and § 3 of the Clayton Act because they neither eliminated significant competition nor foreclosed a substantial share of the relevant market.

▮ The Court's conclusions regarding § 1 of the Sherman Act and § 3 of the Clayton Act do not, however, preclude a jury from finding that PP & L offered the conversion grants for an improper purpose and thereby tortiously interfered with Plaintiffs' contractual relations. PP & L's actions need not be unlawful under federal antitrust statutes to be tortious. A jury must evaluate whether PP & L either (1) simply extolled the virtues of its products through promotional incentives or (2) interfered with Plaintiffs' contractual relations with existing homeowners. *See* Restatement (Second) of Torts § 766 cmt. m (remarking that A may induce B to sever his business relations with C by offering "B a better bargain than that which he has with C. Here ... a nice question of fact is presented. A's freedom to conduct his business in the usual manner ... is not restricted by the fact that B has agreed to buy similar goods from C"); Restatement (Second) of Torts § 767 cmt. c (stating "[c]onduct specifically in violation of statutory provisions ... may for that reason make an interference improper. This may be true ... of conduct that is in violation of antitrust provisions"). PP & L has failed to eliminate from the Rule 56 record all genuine issues of material fact regarding the use and purpose of the conversion grants. Because a fact question exists whether such use was "improper," the Court declines to award summary judgment.

### 2. Unfair Competition

▮ Count VII of the Amended Complaint states a cause of action styled "Unfair

Methods of Competition" and alleges that the all-electric agreements and conversion grants "constitute an unfair method of competition, in violation of Pennsylvania state law." (Am. Compl.¶ 81). Plaintiffs fail to articulate, however, the specific Pennsylvania state-law to which they are referring. The Court first assumes that Plaintiffs rely on 73 Pa. Stat. Ann. § 201–2(4) (West 1993) (defining "Unfair methods of competition"). The conduct proscribed by that section, however, does not encompass the conduct complained of in the instant case. *See Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 307 (3d Cir.1995) (noting "[i]n Pennsylvania, only malfeasance, the improper performance of a contractual obligation, raises a cause of action under the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 *et seq.*").

■ The language in § 201–2 sounds in deception, misrepresentation, confusion, disparagement, and fraud. The statute does contain a "catchall" provision that includes, in its definition of "unfair," "[e]ngaging in any other fraudulent conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Stat. Ann. § 201–2(4)(xvii). This provision, however, applies only to fraudulent conduct. *See Hammer v. Nikol*, 659 A.2d 617, 619–20 (Pa.Commw.Ct.1995) (remarking "to recover under the catchall provision, the elements of common-law fraud must be proven") (citation omitted). While Plaintiffs in the actual case have presented several allegations of antitrust violations, they have not produced any evidence of fraudulent, disparaging conduct that the Unfair Trade Practices and Consumer Protection Law aims to protect.

■ The common-law claim of unfair competition does, however, provide Plaintiffs with a cognizable cause of action. Restatement (Third) of Unfair Competition § 1 provides, in part:

> One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for harm unless:
>
> (a) the harm results from ... other actions or practices of the actor determined to be actionable as an unfair

method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public; or

> (b) the acts or practices of the actor are actionable by the other under federal or state statutes ...

Restatement (Third) of Unfair Competition § 1 (1995). An accompanying comment explains this provision: "[s]ubsection (a) therefore includes a residual category encompassing other business practices determined to be unfair.... An act or practice is likely to be judged unfair only if it substantially interferes with the ability of others to compete on the merits of their products." *Id.* at § 1 cmt. g. *See also Lakeview Ambulance and Medical Servs., Inc. v. Gold Cross Ambulance and Medical Serv., Inc.*, No.1994–2166, 1995 WL 842000, at *2–3 (Pa. Ct. Common Pleas Oct. 18, 1995) (finding cause of action under Restatement (Third) of Unfair Competition § 1). Because the record contains fact issues concerning whether PP & L violated the various federal antitrust statutes, the Court considers summary judgment on Plaintiffs' common-law claim for unfair competition to be inappropriate.

### 3. Restraint of Trade

■ "[T]he Sherman Act is merely the application of the common-law doctrine concerning the restraint of trade to the field of interstate commerce." *Lakeview*, 1995 WL 842000, at 4 (citing *Collins v. Main Line Bd. of Realtors*, 452 Pa. 342, 304 A.2d 493, 496, *cert. denied*, 414 U.S. 979, 94 S.Ct. 291, 38 L.Ed.2d 223 (1973)). Because of this similarity, the Court's decision regarding Plaintiffs' common-law restraint of trade claim mirrors the conclusion reached in assessing Plaintiffs' claim under § 1 of the Sherman Act. The Court denies summary judgment with respect to the all-electric agreements and grants summary judgment with respect to the conversion grants.

### 4. Civil Conspiracy

■ Finally, Plaintiffs' cause of action for civil conspiracy survives summary judgment. To establish civil conspiracy,

Plaintiffs must demonstrate "that two or more persons combined or agreed with the intent to do an unlawful act or to do an otherwise lawful act by unlawful means.... Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy.... This unlawful intent must be absent justification." *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 472 (1979) (citations omitted). The record contains sufficient evidence of PP & L's specific intent to raise a genuine issue of material fact as to PP & L's motivation and whether PP & L's conduct was unlawful.

## F. CONCLUSION

Accordingly, PP & L's Motion for Summary Judgment is granted with respect to (1) Plaintiffs' claim of actual monopolization under § 2 of the Sherman Act; (2) Plaintiffs' claims involving the conversion grants under both § 1 of the Sherman Act and § 3 of the Clayton Act; (3) Plaintiffs' claim under § 2(c) of the Robinson–Patman Act; and (4) Plaintiffs' common-law restraint of trade claim (conversion grants only). The following causes of action proceed to trial: (1) § 1 of the Sherman Act (all-electric agreements/new homes only); (2) § 2 of the Sherman Act (attempted monopolization, leveraging of monopoly, abuse of monopoly power, predation through governmental processes, and conspiracy to monopolize only); (3) § 3 of the Clayton Act (all-electric agreements/new homes only); (4) tortious interference with contractual relations (conversion grants only); (5) restraint of trade (all-electric agreements/new homes only); (6) unfair competition; and (7) civil conspiracy.